UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
JESUS SANTIAGO

       Plaintiff,

       -against-                12-CV-2137(KAM)(SLT)

BRIAN FISCHER, INDIVIDUALLY AND
AS COMMISSIONER OF THE NEW YORK
STATE DEPARTMENT OF CORRECTIONS
AND COMMUNITY SUPERVISION, et al.,

       Defendants.
----------------------------------X

**KIYO MATSUMOTO, United States District Judge:**

       Plaintiff Jesus Santiago filed this lawsuit in 2012 against Defendants Brian Fischer ("Fischer") then-Commissioner of the New York State Department of Correctional Services ("DOCS"), Anthony Annucci ("Annucci"), then-Chief Counsel to DOCS, now Acting Commissioner of the Department of Corrections and Community Supervision ("DOCCS")[1], and Terrence Tracy ("Tracy"), then-Chief Counsel to the New York State Division of Parole ("DOP") (collectively, "Defendants").  Santiago alleged that the three state officials violated his constitutional rights when they enforced a term of post-release supervision ("PRS") that had been unlawfully administratively added to his

---

[1] During the relevant period to Plaintiff's case, the Department of Correction Services (DOCS) and Division Parole (DOP) were known as two separate agencies, but the Court notes that DOCS and DOP are now joined under the New York State Department of Corrections and Community Supervision (DOCCS).  (ECF No. 193, Joint Stipulations of Fact at 1.)

custodial sentence.  (*See generally* ECF Nos. 1, Compl.; 12, Am. Compl.)

        As the Court observed when granting Plaintiff's motion for summary judgment (ECF No. 92, Memorandum and Order issued September 30, 2017 ("Sept. 30, 2017 Order") at 2), "this is the rare case in which many of the issues presented by the parties have been extensively litigated before other district courts in New York, and before the Second Circuit." *See, e.g.*, *Earley v. Murray*, 451 F.3d 71 (2d Cir. 2006) ("*Earley I*"), *reh'g denied*, 462 F.3d 147 (2d Cir. 2006) ("*Earley II*"); *Vincent v. Yelich*, 718 F.3d 157, 173 (2d Cir. 2013); *Betances v. Fischer*, 837 F.3d 162, 165 (2d Cir. 2016) ("*Betances II*"); *Hassell v. Fischer*, 879 F.3d 41, 51 (2d Cir. 2018); *Vincent v. Annucci*, 63 F.4th 145, 148 (2d Cir. 2023) (noting that the most recent Second Circuit appeal is part of "a decades-long series of litigations over DOCS's unconstitutional imposition of PRS and re-incarceration of felons who violated the terms and conditions of their unlawful PRS" and that "[a]ccordingly, some familiarity with this court's sequence of decisions is presumed".)[2]

        On September 30, 2017, based on Second Circuit precedent, this Court granted summary judgment to Plaintiff, finding Defendants Fischer, Annucci, and Tracy liable under 42

_____

[2] The Court refers to those decisions for a detailed discussion of the factual and legal issues surrounding the administrative imposition of PRS and highlights only the key facts and holdings applicable to this motion.

U.S.C. § 1983 for failing to take reasonable steps to relieve Plaintiff of the burdens of the unlawful term of post-release supervision that had been administratively imposed by DOCS. (ECF No. 92, Sept. 30, 2017 Order.)  The Court found Defendants liable for violating Plaintiff's constitutional rights for the time period from June 12, 2007 to February 6, 2008, when he was incarcerated because of violations of illegally imposed PRS. (*Id.*)  Noting that the Second Circuit remanded the *Betances II* case back to the district court to assess whether "there were any outstanding questions relating to causation of damages as to specific plaintiffs' claims," this Court did not impose any damages in its summary judgment decision.  (*Id.* at 25.)  On September 23, 2019, the Court denied Defendants' motion for summary judgment, to restrict Plaintiff's damages to nominal damages.  (ECF No. 128, Second Memorandum and Order issued on September 23, 2019 ("Sept. 23, 2019 Order").)  The Court found that there remained issues of fact as to what damages Plaintiff was owed, including Defendants' causation of those damages, and accordingly, reserved the question of compensatory and punitive damages for a fact-finding jury.  (*Id.* at 26.)

A jury was selected November 23, 2022, and the case was tried between November 28-30, 2022 on the narrow issue of whether, for the period between June 12, 2007 and February 6, 2008, Plaintiff should be awarded any damages as a result of

Defendants' violations of his constitutional rights.  (*See* ECF Nos. 217-219, Trial Transcript ("Tr.").)[3] [4]  The jury returned a verdict in favor of Plaintiff and awarded Plaintiff (1) compensatory damages in the amount of one hundred thousand dollars ($100,000), jointly and severally against the Defendants, Fischer, Annucci, and Tracy; and (2) punitive damages of two hundred fifty thousand dollars ($250,000) against each of the individual Defendants, Fischer, Annucci, and Tracy, totaling seven hundred and fifty thousand dollars ($750,000), plus pre-judgment interest and post-judgment interest at the rate provided by 28 U.S.C. § 1961.  (ECF No. 209, Judgment.)

Presently before the Court are Defendants' (1) renewed motions for judgment as a matter of law and remittitur pursuant to Federal Rule of Civil Procedure 50(b) ("Rule 50(b)"), and (2) in the alternative, motions for a new trial pursuant to Federal Rule of Civil Procedure 59 ("Rule 59").  (ECF Nos. 211, Defendants' Motion for Judgment as a Matter of Law, or in the Alternative, a New Trial ("Defs. Mot."); 213, Memorandum of Law in Support of the Defendants' Motion for Judgment as a Matter of

---

[3] Jury selection took place on November 23, 2022 and trial started on November 28, 2022 and continued until November 30, 2022.  The jury reached a damages verdict on November 30, 2022.

[4] The Trial Transcript was filed under three separate docket entries, but it is consecutively paginated across those entries.  For the sake of convenience, the Court refers to the Transcript as one document, and citations to page numbers refer to the numbers in the upper right-hand corner of each page.  (ECF Nos. 217, Nov. 28, 2022 Tr.; 218, Nov. 30, 2022. Tr.; 219, Nov. 29, 2022 Tr. (collectively, "Tr.").)  The Court also notes that the three dates of trial transcripts are filed out of order on the docket.

Law, or in the Alternative, a New Trial ("Defs. Mem."); 215, Defendants' Memorandum of Law in Reply ("Defs. Reply"). Plaintiff opposes the Defendants' motions.  (ECF No. 214, Plaintiff's Memorandum of Law in Opposition ("Pl. Opp'n Mem.").)

## Background

The parties' familiarity with the facts and procedural history of this case is presumed.  (ECF Nos. 92, Sept. 30, 2017 Order, at 2-8; 128, Sept 23, 2019 Order at 2-11; 139, Trial Joint Stipulation of Facts ("Joint Stip.").)  Facts relevant to the instant motions are provided be set forth herein.

New York's "Jenna's Law," enacted in 1998 and codified in New York Penal Law § 70.45(1), mandated that "[e]ach determinate sentence [of incarceration] also includes, as a part thereof, an additional period of post-release supervision." N.Y. Penal Law § 70.45(1) (2005).  Despite Jenna's Law, the Second Circuit found, as occurred here, that "some [state] judges did not pronounce PRS terms during sentencing proceedings" and "[i]nstead of bringing the failure to the attention of the sentencing court, DOCS simply added the PRS term administratively." *Betances II*, 837 F.3d at 165.  In such cases, "the inmates began to serve their PRS terms under DOP supervision," and "DOCS and DOP were authorized to reincarcerate an offender who, after a hearing, was found to have violated the conditions of release." *Id.*  Plaintiff Santiago was among the

individuals who was sentenced without a judicially imposed term of PRS, served his incarceration sentence, and was again incarcerated specifically for violating the administratively imposed term of PRS, under the policies and practices of the three individual Defendants.

On June 9, 2006, in *Earley I*, the Second Circuit ruled that "the Constitution forbids DOCS from modifying a sentence imposed by a judge," including in cases where DOCS had administratively modified a sentence to add a period of PRS where such a term was mandated by Section 70.45(1) [Jenna's Law] but had not been imposed by a sentencing judge. *Id.* (*citing Earley I*, 451 F.3d at 74-76). In *Betances II*, the Second Circuit further clarified that despite the difficulties of resentencing, and the resistance of some other parties, including state courts and District Attorneys, to *Earley I*, the individual Defendants Fischer, Tracy, and Annucci "were responsible for designing and implementing their departments' response [or lack thereof] to *Earley I*" but "did not make an objectively reasonabl[e] effort to relieve [plaintiffs] of the burdens of those unlawfully imposed terms after [they] knew it had been ruled that the imposition violated federal law," and, therefore, the Defendants were not entitled to qualified immunity. *Id.* at 167, 173-75 (quotation omitted).

Accordingly, on September 30, 2017, in this case, the

Court found the three Defendants' liable for violating
Plaintiff's constitutional rights during the time period between
June 12, 2007, and February 6, 2008.  (ECF No. 92, Sept. 30,
2017 Order at 1-2.)  The Court found that during this period,
the three individual Defendants (1) had admitted in the *Betances
II* litigation and in this case that they were aware of their
obligation to address unlawfully imposed terms of PRS and (2)
had custody over Plaintiff and could therefore have taken steps
to relieve Plaintiff of the administratively imposed PRS.  (*Id*.
at 32-36) (citing *Betances II*, 837 F.3d at 174.)  Defendants,
moreover, as the Second Circuit noted in *Betances II,* could have
rectified this situation either by seeking resentencing to have
a judge properly impose the PRS term on Plaintiff, or by
excising the PRS term from those Plaintiff's sentence.  (*Id*.)
Defendants failed to do either, continuing to violate
Plaintiff's constitutional rights despite decisions from the
Second Circuit that their actions were unconstitutional.  (*Id*.)

On September 23, 2019, the Court denied Defendants'
summary judgment motion, which sought to limit Plaintiff's
damages to only nominal damages, based on disputed issues of
material fact. (ECF No. 128, Sept. 23, 2019 Order at 2.)  The
Court did not decide whether the Plaintiff could establish that
he was entitled to punitive damages.  (*Id*. at 26.)

On June 16, 2022, the Court denied Defendants' request

7

to file a second motion for summary judgment (which would have
resulted in the third summary judgment motion and decision in
this case), finding that Defendants had been provided multiple
opportunities to proffer the evidence they alluded to in their
pre-motion conference letter.  (Minute Entry dated June 16,
2022; *see also* ECF No. 173, Defs. Pre-Motion Conf. Request
Letter.)  The Court set a trial date, leaving the jury to decide
whether and how much Santiago should receive in damages for the
violation of his constitutional rights by Defendants.  (ECF No.
174, Civil Pre-Trial Order.)

     The parties filed their fully briefed motions *in
limine* by July 30, 2022.  (ECF Nos. 176-181.)  Defendants'
motions *in limine* requested that the Court: "(1) preclude
Plaintiff from offering speculation that he would have been
relieved of post-release supervision ('PRS') or at liberty,
given Penal Law § 70.45 and his sentences imposed by courts in
the federal system and in the State of Virginia; (2) permit
Defendants to introduce evidence as to Plaintiff's sentences
imposed by courts in the federal system and in the State of
Virginia; (3) permit Defendants to argue that they were not the
cause of any damages Plaintiff claims and to introduce evidence
of the positions taken by District Attorneys and State courts as
to PRS; (4) permit Defendants to introduce evidence that
Plaintiff would have been incarcerated or would have been

serving terms of supervision in any event, even if Plaintiff had not been serving PRS in New York; (5) require Plaintiff to bear the burden of proof that his life would have been different had he been resentenced at an earlier date."  (ECF No. 176, Defendants' Motion *in Limine* ("Defs. MIL").)

The Court ordered the parties to appear for a status conference to discuss the motions *in limine*, and at the conference, ordered the parties to meet and confer and file a joint stipulation of facts and law to resolve some of the parties' evidentiary disputes, including what aspects of Plaintiff's criminal history could be admitted.  (Minute Entry dated Oct. 26, 2022.)  The parties were also specifically advised that the Court would preclude speculative evidence and arguments by either party as to what might have occurred absent the constitutional violation.  (*Id.*)

The Court held its final pre-trial conference with the parties on November 18, 2022 and discussed trial logistics and ruled on the outstanding motions *in limine*.  (Minute Entry and Order dated Nov. 18, 2022.)  The Court denied the third item of Defendants' motion, "to permit Defendants to argue that they were not the cause of any damages Plaintiff claims, and to introduce evidence of the positions taken by District Attorneys and State courts as to PRS" as a reason for their failure to comply with *Earley I*, based on the Second Circuit's decisions

and Defendants' failure to produce the evidence to Plaintiff in
their Rule 26 disclosures or in support of their motion.
*Betances II*, 837 F.3d at 174 (finding that whether or not there
was a "formal mechanism" to initiate resentencing, "the
[Defendants'] decision to review . . . records and notify state
judges and district attorneys about defendants who needed to be
resentenced required no cooperation from others" and "[i]f the
district attorneys and judges ultimately rejected compliance,
the re-sentencings would not have taken place, but the
defendants [Fischer, Annucci, and Tracy] would have satisfied
their obligation").

Defendants also moved *in limine* to admit evidence that
their reliance on Penal Law § 70.45 was relevant to punitive
damages.  (ECF No. 176; Minute Entry and Order dated Nov. 18,
2022.)  Despite Defendants' failure to proffer any argument or
analysis in their motions *in limine* about the relevance of Penal
Law § 70.45 to punitive damages, on November 18, 2022 at the
final pre-trial conference, the Court provided the parties one
last opportunity to further brief Defendants' request to
"introduce evidence as to Penal Law § 70.45."  (*Id.*)

The Court considered the supplemental briefing prior
to trial and denied Defendants' request to "introduce evidence
as to Penal Law § 70.45" on the question of punitive damages
because even if the evidence were minimally relevant to punitive

10

damages, its admission was outweighed by the risk of unfair prejudice and confusing the jury.  (*See* ECF No. 202, Nov. 25, 2022 Order at 7-8.)   The Court held that Penal Law § 70.45 and the legislative history and subsequent amendments that Defendants sought to introduce, were irrelevant to the issue of punitive damages, and noted that the Second Circuit already had rejected the Defendants' argument that their unconstitutional conduct was excused by Penal Law § 70.45.  (*Id.* at 2-4) citing *Earley I*, 451 F.3d at 76 (holding that the DOCS practice of adding PRS to a sentence where Penal Law § 70.45 required it, but the sentencing judge had not imposed it, was unconstitutional), *reh'g denied*, *Earley II*, 462 F.3d 147; *Betances II*, 837 F.3d at 165).)  "Defendants' argument that they could properly rely on Penal Law § 70.45 after *Earley I* and *Earley II* is difficult to square with the statutory text and cannot be reconciled with Second Circuit precedent.  Penal Law § 70.45 has not ever, on its face, stated that DOCS was authorized to administratively impose post-release supervision; thus the existence of a state law does not excuse Defendants from scrupulously following the federal Constitution."  (*Id.* at 4.)

On November 28, 2022, after the close of Plaintiff's case,[5] Defendants moved under Rule 50(a) for judgment as a matter

---

[5] Plaintiff rested their case on the first day of trial.  (*Id.* at 203.)

of law, "to dismiss Plaintiff's punitive damages claim on the grounds that there [was] insufficient evidence to go to a jury to determine whether punitive damages are warranted."  (Tr. at 204.)[6]  The Court denied Defendants' Rule 50 motion regarding punitive damages, based on the evidence in the record, the decisions of the Second Circuit, and this Court's prior rulings. (Minute Entry and Order dated Nov. 28, 2022.)

Trial proceeded on November 28, 2022 and November 29, 2022.  (Minute Entries dated Nov. 28-29, 2022.)  The Court reviewed the parties' requests to charge the jury, provided copies of the Court's proposed charges, and held a charging conference with the parties on November 29, 2022.  (ECF Nos. 203-04, Proposed Jury Instructions and Verdict Form; Minute Entry dated Nov. 29, 2022, Charging Conf.)  Based on the charging conference, the Court provided the parties with revised charges (ECF No. 205, Final Jury Instructions and Verdict Form), and hearing no further objections, charged the jury.  (Minute

---

[6] Defendants' counsel argued in her oral Rule 50(a) motion that, "[t]here's basically been no testimony whatsoever as to the reasons taken behind the actions of the individual defendants . . . [and] no testimony as to what actually. . . was being done during that time period."  (Tr. at 204.) Contrary to defense counsel's argument, as discussed further below, the parties *did* present evidence at trial about what "was actually . . . being done during that time period."  Each of the Defendants testified to the various impediments they faced in complying with *Earley I*.  That Defendants were confused about how to read *Earley I* is not a justification the Second Circuit—even considering the recent Second Circuit decision in *Vincent v. Annucci*—has accepted as sufficient to relieve Defendants of any finding of causation or liability.  63 F.4th 145, 2023 WL 2604235 (2d Cir. Mar. 23, 2023).

Entry dated Nov. 29, 2022.)

On November 30, 2022,  the jury returned a verdict in favor of Plaintiff and awarded Plaintiff (1) compensatory damages in the amount of one hundred thousand dollars ($100,000), jointly and severally against the Defendants, Fischer, Annucci, and Tracy; and (2) punitive damages of two hundred fifty thousand dollars ($250,000) against each of the individual defendants, Fischer, Annucci, and Tracy, totaling seven hundred and fifty thousand dollars ($750,000), plus pre-judgment interest and post-judgment interest at the rate provided by 28 U.S.C. § 1961.  (ECF No. 209, Judgment.)

Presently before the Court are Defendants' (1) renewed motions for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), and (2) in the alternative, motions for a new trial pursuant to Federal Rule of Civil Procedure 59 and remittitur.

In their Rule 50(b) motions, Defendants assert three arguments: (1) Plaintiff conceded at trial that Defendants evinced no malicious intent or evil motive; (2) the record does not support any finding that any Defendant acted with "reckless or callous disregard" of Plaintiff's rights; and (3) the jury's punitive damages award here "most likely flowed from a conclusion on their part that, but for the inactions of Defendants in referring Plaintiff back to the sentencing court,

Plaintiff would never have been imprisoned in New York State for having violated the terms of his PRS."   (ECF No. 213, Defs. Mem. at 1-2.)

In their alternative Rule 59 motion, Defendants argue that a new trial should be ordered because: (1) the Court "erroneously precluded Defendants from offering evidence in their defense," about Defendants' "fair and reasonable understanding and interpretation of the law and circumstances existing at the time, including (i) New York Penal Law § 70.45 (or "Jenna's Law"); and (ii) the district attorneys' position that PRS was incorporated in sentences by operation of law"; and (2) "the jury should have been instructed to determine whether Plaintiff would have received the same post-release supervision term if he had received the process he was due—referral for possible resentencing—at the relevant times[.]"   (*Id*. at 2.)

On April 6, 2023, the parties provided supplemental briefing on a recent Second Circuit decision, *Vincent v. Annucci*, 63 F.4th 145 (2d Cir. 2023), in which the Second Circuit remanded a summary judgment decision back to district court, holding that:

> [T]he court improperly declined to consider what steps were feasibly and legally available to Annucci, did not discuss Vincent's burden of proving damages, and did not determine whether Vincent had met that burden.  The district court's cursory treatment of damages causation does not comport with our precedent

14

> and thus warrants remand and reconsideration
> . . . . Accordingly, on remand, we direct the
> district court to clarify that question,
> bearing in mind that the burden rests upon the
> plaintiff to establish the onset date for
> calculating any compensatory damages to which
> he may be entitled. If no such impediment
> existed, the plaintiff will have satisfied his
> burden upon the existing record. If an
> impediment is claimed, the district court must
> determine its validity and effect, if any,
> upon the length of Vincent's unlawful
> incarceration.

*Id.* at 152.

The Court notes that unlike the trial verdict in the

instant action, *Vincent* considered the district court's grant of

summary judgment awarding plaintiff $150,000 in compensatory

damages, without a full review of the facts related to his

injuries and any "impediments" that Annucci faced in complying

with *Earley I*.[7]  In the instant case, the parties stipulated to

the damages period between June 12, 2007 and February 6, 2008

and both of the parties moved for summary judgment.[8]  In over a

decade since this action was commenced, Defendants could have

raised and presented evidence to the Plaintiff in discovery, and

to the Court in motion practice, of any impediment to rectifying

the constitutional violations clearly identified in *Earley I* of

---

[7] As summarized above, this Court in the instant action did not decide the
issue of damages and causation of damages at summary judgment, precisely
because it found there were remaining issues of fact for a jury to decide.
(ECF Nos. 92, Sept. 30, 2017 Order at 25; 128, Sept. 23, 2019 Order at 26.)
[8] Here, the Defendants also filed multiple motions *in limine* and the Court
heard arguments, many of which were not cabined to evidentiary arguments, but
also Defendants' legal arguments.

15

administratively imposed PRS.  Most distinctly from the *Vincent* case, the parties here proceeded to a full trial in which they testified to their understanding, experiences, and perceived obstacles to complying with *Earley I*, and the steps they took specifically with respect to Santiago's illegal PRS sentence. *See infra* at 59.  At trial, the Plaintiff also presented evidence of damages from the loss of his liberty that he suffered as a result of the illegal PRS sentence between June 12, 2007 to February 6, 2008.

On the issue of damages, after fully hearing the parties at the charging conference, and without objection from Defendants, the Court instructed the jury:

> [T]he plaintiff has the burden of proving the material aspects of his damages claim by a preponderance of the evidence . . . . The burden is on the defendant to prove the mitigation by a preponderance of the evidence, that the plaintiff could have lessened the harm that was done to him and that he failed to do so. If the defendant convinces you that the plaintiff could have reduced the harm done to him and failed to do so, the plaintiff is entitled only to damages sufficient to compensate him for the injury that he would still have suffered even if he had taken appropriate action to reduce the harm done to him.

(Tr. at 352, 367.)

In stark contrast to the *Vincent* case, Plaintiff in this case presented evidence of his damages resulting from Defendants' violations of his rights, and Defendants presented

16

testimony that they "understood that *Earley* did not require unilateral release by DOCS" and testified to the perceived logistical difficulties they faced in doing so, which includes not knowing who the individual Plaintiff was.  (Tr. at 106-08, 132-38, 164, 171-72, 201-02, 218.)[9]  The jury weighed the evidence, drew inferences based on the evidence, made credibility determinations, and reached findings in reaching their verdict, including the award of damages.  The holding of *Vincent*, that additional fact-finding is required to determine whether Defendants faced any legal impediment to release and thereby rectify the illegal PRS, is thus inapplicable to Defendants' motions.

    The Court will now address Defendants' Rule 50(b) and Rule 59 motion in turn.

**I.    Defendants' Rule 50(b) Motion for a New Trial**

**A.   Legal Standard Defendants' Rule 50(b) Motions to Set Aside the Verdict**

    Rule 50(a) of the Federal Rules of Civil Procedure permits a party to move for judgment as a matter of law after a party has been fully heard and before a case is submitted to the

---

[9] The portions of the trial transcript cited in Defendants' memorandum of law in support of their post-trial motions show that Defendants testified about their "understanding and interpretation of the law and circumstances existing at the time" and why they did not excise the Plaintiff's illegal PRS sentence or refer him for resentencing.  The trial evidence established that Defendants did not attempt to excise the illegal PRS they imposed or refer Plaintiff for resentencing.

jury.  Fed. R. Civ. P. 50(a).  A motion made pursuant to Rule 50(a) "must specify the judgment sought and the law and facts that entitle the movant to the judgment."  *Id.*  If the Court denies a party's Rule 50(a) motion, the movant may file a renewed motion for judgment as a matter of law no later than 28 days after entry of judgment.[10]  Fed. R. Civ. P. 50(b).  "In ruling on the renewed motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." *Id.*

After an unfavorable verdict, a party may renew its motion for judgment as a matter of law under Rule 50(b) and may include a request for a new trial under Rule 59. The standard of review for motions under Rule 50(a) and Rule 50(b) is the same. *Alfaro v. Wal-Mart Stores*, 210 F.3d 111, 114 (2d Cir. 2000). "In considering a motion for judgment as a matter of law, the district court 'must draw all reasonable inferences in favor of the nonmoving party.'" *Zellner v. Summerlin*, 494 F.3d 344, 370 (2d Cir. 2007) (quoting *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 150 (2000)).  The Court must not, however, make credibility determinations or weigh the evidence because "'[c]redibility determinations, the weighing of the evidence, and the drawing of

---

[10] The parties do not dispute that Defendants' Rule 50(a), 50(b), and 59 motions are timely.

legitimate inferences from the facts are jury functions, not those of a judge.'" *Id.* (quoting *Reeves*, 530 U.S. at 150). Consequently, "'although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.'" *Id.*; *see also Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970 (2d Cir. 1987) (a court "cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury") (internal quotation marks omitted).

The movant thus bears a heavy burden, because "a court may grant a motion for judgment as a matter of law 'only if it can conclude that, with credibility assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been compelled to accept the view of the moving party.'" *Zellner*, 494 F.3d at 370-71 (quoting *Piesco v. Koch*, 12 F.3d 332, 343 (2d Cir. 1993)). If the court finds that a jury would not have had a legally sufficient evidentiary basis to find for a party on an issue, judgment as a matter of law is appropriate. *Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011). In other words, the Court may grant a Rule 50(b) motion for judgment as a matter of law only if the record contains "'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the

result of sheer surmise and conjecture, or . . . such an overwhelming amount of evidence in favor of the movant that reasonable and fair-minded [jurors] could not arrive at a verdict against [it].'"  *Concerned Area Residents for Env't v. Southview Farm*, 34 F.3d 114, 117 (2d Cir. 1994) (quoting *Song v. Ives Lab., Inc*., 957 F.2d 1041, 1046 (2d Cir. 1992)).  The Court reviews the moving Defendants' Rule 50(b) motions in light of these considerations.

> **B.   Application**

> **1.   The Evidence at Trial Need Not Show "Malicious Intent or Evil Motive" for an Award of Punitive Damages**

As an initial matter, with respect to Defendants' challenge to punitive damages awarded by the jury, this Court need not consider Defendants' argument that Plaintiff conceded at trial that Defendants evinced no malicious intent or evil motive, because punitive damages may be awarded if Defendants acted with reckless or callous disregard of Plaintiff's rights. The Supreme Court expressly held in *Smith v. Wade* that, "reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law, should be sufficient to trigger a jury's consideration of the appropriateness of punitive damages."  461 U.S. 30, 51 (1983); *see Wiercinski v. Mangia 57, Inc*., 787 F.3d 106, 115 (2d Cir. 2015) ("The Supreme Court has explained that punitive damages

are appropriate only 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless *or* callous indifference to the federally protected rights of others.'" (emphasis added) (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999))).  Pursuant to the Supreme Court's holding in *Smith*, this Court ruled in its decision on the motions *in limine* (ECF No. 202, Nov. 25, 2022 Order at 6-7) and at the charging conference, that in order for the jury to consider and award punitive damages, there need not be evidence that Defendants had "evil motive or intent," and that evidence that the Defendants acted with "reckless or callous disregard" and also violated federal law sufficed.

At the charging conference, Defendants did not specifically object to the punitive damages instruction.  Now in their post-trial motions, the Defendants do not proffer legal support for their position that the jury would have had to find "evil motive or intent" by Defendants.  Nor do Defendants argue that evidence of a Defendant's "reckless or callous disregard of Plaintiff's constitutional rights" would not be sufficient for a jury to award punitive damages.  (Tr. at 254-270.)  Accordingly, the Court will focus only on whether the jury had sufficient evidence to find Defendants acted or failed to act with "reckless or callous disregard for the plaintiff's rights." *Smith*, 461 U.S. at 51.

**2.   The Evidence at Trial was Sufficient to Support an Award of Punitive Damages**

The Court finds that the trial evidence is sufficient to support the jury's award of punitive damages against each Defendant, based on evidence of Defendants' "reckless or callous disregard for the plaintiff's rights," and admitted failures to comply with the *Earley I* ruling that their administrative imposition (and enforcement) of PRS violated the Constitution.

Defendants repeat their previous arguments that the individual Defendants "had no personal knowledge of Plaintiff, their agencies had no records confirming whether PRS was pronounced by his sentencing judge, and, at the time, many state and federal courts, in disagreement with *Earley*, found Defendants' conduct reasonable."  (ECF No. 215, Defs. Reply at 3.)  Defendants ignore trial evidence that all three Defendants, two of whom are attorneys, were aware of *Earley I*, and the Second Circuit's ruling that the DOCS imposition and DOP's enforcement of illegal PRS supervision violated the United States Constitution.  (Tr. at 99,[11] 161,[12] 188.[13])  Defendants

---

[11] PLAINTIFF'S COUNSEL: And, so, would it be fair to say that you read the *Earley* decision very carefully after it came down? / ANNUCCI: Yes. / COUNSEL: In fact, you had read that decision by—within at least a month after it came out; right? / ANNUCCI: Yes.

[12] PLAINTIFF'S COUNSEL: Now, following the *Earley* decision, did you review the actual order itself, carefully? / TRACY: Which order? / COUNSEL: The first *Earley* decision in 2006. / TRACY: I read it.  I read it.  When you say carefully, I pretty much read everything carefully, but I read it.

[13] PLAINTIFF'S COUNSEL: Shortly after you became commissioner in January of 2007, you were made aware of the Second Circuit's holding in the *Earley* case, correct? / FISCHER: Correct. / COUNSEL: And, in fact, it was your co-

also argue in their post-trial motions that they were not required by *Earley I* to unilaterally release individuals from the illegal PRS that they administratively imposed*,* (ECF No. 213, Defs. Mem. at 6, 9, 10, 11), and that the evidence at trial demonstrates that they did not act with delay and took actions to address the Second Circuit's mandate immediately. (*Id.* at 7-9, 11.)

Notwithstanding the evidence at trial as to each Defendant, discussed further below,[14] Defendants' argument in their briefing evinces a continuing "disregard" of the multiple Second Circuit rulings regarding Defendants' relevant authority and responsibilities as executive-level heads of DOCS and DOP. The trial evidence demonstrated their knowledge of the *Earley I* decision soon after it was issued in 2006, and their refusal to either excise illegal PRS sentences or to refer those individuals for resentencing—instead continuing, with knowledge,

---

defendant who testified earlier, Acting Commissioner Annucci, who was DOCS's counsel at the time, who informed you of all of the issues raised by *Earley*, correct? / FISCHER: That's correct. / COUNSEL: You were specifically made aware that the decision in *Earley* affected your agency's policy concerns PRS, post-release supervision? / FISCHER: Correct.

[14] The parties' joint stipulation of facts was entered as a joint Court exhibit at trial, titled Court Exhibit 1, which the Court read into the record before opening statements.  That joint stipulation of facts and the parties' examination of Defendants and Plaintiff who testified at trial provided evidence for the jury to consider in assessing the compensatory and punitive damages.  In Court Exhibit 1, the parties stipulated to the jury: "On June 6, 2006, the United States Court of Appeals for the Second Circuit ruled that post-release supervision in New York must be imposed at sentencing by a judge, and not calculated by DOCS.  The Second Circuit ruled that a sentence that contained a post-release supervision term that was calculated by DOCS, and not imposed by a judge violated due process rights under the United State Constitution."  (ECF No. 193-1, Court Ex. 1 at ¶¶ 35-36.)

to violate the constitutional rights of such individuals,
including Plaintiff's.

In ruling on the parties' pre-trial motions, this
Court previously relied on and summarized the Second Circuit's
holdings on these issues:

> [T]he Second Circuit has held that Defendants
> did not have a legitimate basis for failing to
> follow *Earley I*.  In 2016, the Second Circuit
> found that "[t]he [same] three [D]efendants
> became aware of *Earley I*'s holding at
> different times," and noted that Defendant
> Annucci despite "immediately under[standing]
> *Earley I*'s holding [in 2006] . . .
> deliberately refused to change DOCS procedures
> to bring them into compliance." *Betances II*,
> 837 F.3d at 167.  The *Betances II* court found
> that Defendant Fischer understood *Earley I*'s
> holding but agreed with Defendant Annucci's
> decision not to follow it.  *Id.*  Defendant
> Tracy was also aware of and understood *Earley
> I* and decided not to follow it.  Instead,
> Defendant Tracy "affirmatively decided to
> continue [the state agency's] former approach
> in contravention of *Earley I*."  *Id.* at 168.
> Citing Defendants' depositions and testimony,
> the Second Circuit concluded that, in not
> making "an objectively reasonable effort to
> relieve plaintiffs of the burdens of those
> unlawfully imposed [PRS] terms after they knew
> it had been ruled that the imposition violated
> federal law," "[a]ll three [Defendants]
> confirmed that their noncompliance was not the
> result of oversight or confusion; they
> understood that *Earley I* required them to
> change their [unconstitutional] practices but
> affirmatively decided not to do so."  *Id.* at
> 167-69, 172-74.

(ECF No. 202, Nov. 25, 2022 Order at 4-5.)

The Second Circuit also had previously addressed the

issue of whether the "steps" Defendants claim they took after

*Earley I* were sufficient:

> [Defendants] contend that they acted with objective reasonableness in responding to the *Earley I* decision, citing the same steps they relied on in the *Betances* litigation. But those steps, set out in the margin, were primarily taken between 14 and 19 months after the decision in *Earley I*, as we pointed out in *Betances II*, 837 F.3d at 172, and that decision has already determined that these steps were not an objectively reasonable justification for the defendants' delay in seeking resentencing of prisoners with administratively imposed PRS terms. "That the defendants eventually took reasonable steps to comply with *Earley I* cannot excuse their unreasonable delay in doing so." *Id.*
>
> *Betances II* is indistinguishable from Hassell's case. Like the plaintiffs in *Betances II*, Hassell is an offender "subject to [a] mandatory PRS term[ ]" after June 9, 2006, and who alleged that the term was imposed by "DOCS, rather than [his] sentencing judge." *Id.* at 170. Accordingly, the defendants are foreclosed by *Betances II* from arguing that their belated, albeit reasonable, steps to comply with *Earley I* excuse the initial unreasonable delay.

*Hassell v. Fischer*, 879 F.3d 41, 50-51 (2d Cir. 2018).

Notwithstanding that the Court was guided by the

Second Circuit's decisions, Defendants testified at trial about

their knowledge of *Earley*, their views regarding *Earley*, and for

their response or lack of response. The Second Circuit has

issued multiple opinions addressing whether Defendants took

reasonable actions, post *Earley*, to alleviate the injury of

their constitutional violations and found that they had not.
*Earley I*, 451 F.3d 71, reh'g denied, *Earley II*, 462 F.3d 147;
*Vincent*, 718 F.3d at 173; *Betances II*, 837 F.3d at 165 (2d Cir.
2016); *Hassell*, 879 F.3d at 50-51; *Vincent*, No. 21-22, 63 F.4th
145, 2023 WL 2604235 at *5 (2d Cir. Mar. 23, 2023) ("As we have
previously explained, Annucci's liability 'arose from [his]
unreasonable delay in acting to comply with *Earley I* for many
months after that decision'").[15]   Evidence in the record
establishes that Santiago is in the category of plaintiffs whose
constitutional rights had been violated by Defendants'
imposition of illegal PRS and their subsequent enforcement of
"null and void" PRS and the Defendants' lack of action to either
(1) re-sentence plaintiffs with illegal PRS sentences or (2)
excise the illegal PRS sentence.   Based on evidence at trial,
the jury decided whether Defendants' unreasonable delay in
complying with *Earley I* constituted callous and reckless
disregard of Plaintiff's constitutional rights and caused his
injuries.

---

[15] Judge Kearse also summarizes in her dissent in the most recent Second
Circuit opinion, *Vincent*, "[W]e are unanimous in rejecting Annucci's renewed
contention that he is entitled to qualified immunity from paying money
damages for such violations—a contention definitively rejected in *Betances v.
Fischer*, 837 F.3d 162 (2d Cir. 2016) ("*Betances*") . . ."  Vincent, 63 F.4th
at 155.  She then continued, "I am unable . . . to see that the majority's
decision to remand to the district court to determine whether there was 'any
impediment, legal or otherwise, to Annucci's simply and unilaterally
releasing Vincent,' Majority Opinion *ante* at 154, is reconcilable with the
record in this case."  (*Id.*)

At trial, the evidence established that all three Defendants were aware of *Earley I* in which the Second Circuit ruled that the DOCS imposition and DOP's enforcement of illegal PRS supervision violated federal law, all three defendants failed to seek resentencing or excise Santiago's PRS, which led to his unlawful incarceration.  (*See supra* notes 12-14.) Moreover, the Defendants affirmatively testified that they did not take initial steps to see whether a District Attorney or state court judge would have re-sentenced Plaintiff Santiago. (Tr. at 107,[16] 109,[17] 110,[18] 191-92,[19] 164-65,[20] 242.[21])

---

[16] PLAINTIFF'S COUNSEL: You didn't direct DOCS to start [telling] people that *Earley* had declared their sentences unconstitutional for years later? / ANNUCCI: Correct. / THE COURT: Well, when you say years, can you be more specific, please? / COUNSEL: Approximately two years later. / THE COURT: Ok . . . is that correct? / ANNUCCI: Yes.

[17] PLAINTIFF'S COUNSEL: Now, isn't it true that Mr. Santiago was imprisoned June 12, 2007 precisely because the Department of Correctional Services kept its policy of enforcing these unconstitutional terms of post-release supervision in place? / ANNUCCI: Yes. / COUNSEL: Now, before June 12, 2007, you never asked a judge to re-sentence Mr. Santiago; right? / ANNUCCI: Correct.

[18] PLAINTIFF'S COUNSEL: Prior to June 12, 2007, you never wrote an assistant district attorney in Kings County telling them to apply to have Mr. Santiago resentenced, did you? / ANNUCCI: No.

[19] PLAINTIFF'S COUNSEL: Commissioner [Fischer], prior to 2007, did you ever go to a judge, write to a judge, and ask Mr. Santiago to be resentenced? / FISCHER: No. / COUNSEL: Did you ever approach a district attorney and ask them to facilitate a resentencing for Mr. Santiago? / FISCHER: No. / COUNSEL: Did you take any action whatsoever to help facilitate the resentencing of Mr. Santiago? / FISCHER: No.

[20] PLAINTIFF'S COUNSEL: All right. Now, before June 12, 2007, did you or anybody in your staff ask a judge to re-sentence Mr. Santiago? / TRACY: No. I have no recollection of anyone in my office or myself asking anyone, asking the Court to re-sentence him. / COUNSEL: Before June 12, 2007, did you ever ask a district attorney to apply for resentencing for Mr. Santiago? / TRACY: I have no recollection of doing that.

[21] PLAINTIFF'S COUNSEL: So it's your testimony that prior to the spring of 2008, despite having a list of 8,000 people who might have illegally-imposed post-release supervision, you took no affirmative steps to inform those people of what happened? / ANNUCCI: Other than writing back to those who wrote to me.

Nonetheless, contrary to their post-trial motion, the Defendants had the opportunity to and did testify at trial to any impediments each Defendant perceived to either (1) resentence Plaintiff or (2) excise his illegal PRS sentence as mandated by the Second Circuit and further testified to the steps they took more than a year after *Earley I* was decided. The Defendants testified, and the jurors ultimately found that Defendants' indifference to Plaintiff's constitutional rights warranted the award of compensatory and punitive damages.  It was "fully within the jury's fact-finding discretion to credit portions" or reject portions of the parties' testimony, including testimony regarding the justifications for why Defendants took as long as they did to initiate compliance with *Earley I.  Hoyte v. Nat'l R.R. Passenger Corp.*, No. 04-cv-5297 (GEL), 2006 WL 2053383, at *3 n. 2 (S.D.N.Y. July 24, 2006); *see also Haywood v. Koehler*, 78 F.3d 101, 105 (2d Cir. 1996) ("[I]n most trials . . . the jurors [a]re not required to accept the entirety of either side's account, but [a]re free to accept bits of testimony from several witnesses and to make reasonable inferences from whatever testimony they credit[ ]."); *Piesco v. Koch*, 12 F.3d 332, 343 (2d Cir. 1993) ("It was the responsibility of the jury, not the court, to determine whether her trial testimony should be believed.").

### a)   Testimony of Annucci – then—Chief Counsel to DOCS, now Acting Commissioner of DOCCS

First, the Court finds that the evidence at trial demonstrated that Annucci, who was the Chief Counsel for DOCS at the relevant time, understood the holding of the Second Circuit's decisions and what he had to do to comply, and decided not to do so.  At trial, Annucci was asked and affirmatively answered "yes" to whether he recognized that the Second Circuit's decision in *Earley I* had a "wide-ranging impact" and whether he had read it carefully, within a month of it being issued.  (Tr. at 99, 214.)  Annucci also admitted that he understood that *Earley I* had rendered thousands of administratively imposed PRS sentences as a nullity.  He testified that on July 20, 2006, he sent an email about the holding in *Earley I* to the Assistant Deputy Counsel for Criminal Justice at the New York State Office of Court Administration, to address *Earley I* "going forward," but did not testify that he otherwise discussed excising the illegal administratively-imposed PRS or resentencing with the Office of Court Administration in the July 20, 2006 email.  (*Id.* at 103.) Annucci's July 20, 2006 email to John Amodeo, then-Assistant Deputy Counsel for Criminal Justice at the Office of Court Administration, stated that he expected people to begin challenging their PRS sentences because of the *Earley I*

decision, and admitted that the Second Circuit's holding was controlling authority on the federal Constitution. (*Id.* at 103-05.)

Annucci testified to the administrative difficulties Defendants faced, tracking which criminal defendants had illegal PRS sentences. (*Id.* at 229-31.) Annucci, however, did not explain to the jury why it would have been impossible, or even difficult, to inform the defendants who were potentially affected by the decision in *Earley I*. (*Id.*) Annucci testified that, because of the DOCS database, he knew there were roughly 8,000 individuals who were possibly unlawfully sentenced to PRS. (*Id.* at 229.) Annucci testified that, because of the "ample legal materials being made available in law libraries," he left it up to the incarcerated individuals to determine that their administratively imposed PRS sentences were unconstitutional and advocate for their own relief. (*Id.*) He did not explain why the DOCS and DOP could not have excised the illegally imposed PRS, rather than decide that the burden for rectifying DOCS and DOP's illegal action should fall on wrongfully sentenced, incarcerated individuals. Annucci was unequivocal that the DOCS database, to which he had access, clearly identified each defendant that could be affected by the Second Circuit's *Earley I* decisions. (*Id.* at 230.) Despite access to this information, Annucci testified that he did not inform the District Attorneys'

offices or do anything to rectify the situation, besides responding to the individual letters sent to him by incarcerated individuals who had initiated outreach to his agency. (*Id.* at 230-31.)

Therefore, the Court finds, based on more than sufficient trial evidence, that the jurors reasonably considered Annucci's testimony that he understood *Earley I* soon after it was issued, but did not act to remove or re-sentence the administratively imposed and unconstitutional PRS sentences, which caused daily deprivations of the rights of criminal defendants who were incarcerated because of an illegal, "null and void" PRS sentence. (*Id.* at 107.) The jury heard Annucci testify that he "knew that if [people under administratively imposed PRS] violated [that] post-release supervision . . . they could end up locked up" (*id.* at 109), and that DOCS did not act faster because they "did not have complete records in *every* case." (*Id.* at 138 (emphasis added).)

Finally, Annucci testified that he understood that Santiago was one of the many that were affected by Annucci's delay in reversing the unconstitutional actions of DOCS when it administratively imposed and enforced illegal PRS sentences. (*Id.* at 110-11.) Annucci admitted that even if he did not know who Santiago was individually, that Santiago's constitutional rights were violated, and testified to not fully having read the

opinions of this Court as of the date he testified. (*Id.*)
Annucci answered "yes" when asked whether it was "true that Mr.
Santiago was imprisoned June 12, 2007 precisely because the
Department of Correctional Services kept its policy of enforcing
these unconstitutional terms of post-release supervision in
place." (*Id.* at 109.)  The Court finds that there is sufficient
evidence for the jury to have found unanimously that Annucci's
disregard for the constitutional rights of Santiago and other
similarly affected individual was callous or reckless, and that
compensatory and punitive damages were warranted.

### b)   Testimony of Tracy – then-Chief Counsel to the New York State Division of Parole

The Court also finds that there was sufficient
evidence at trial for a jury to find that Defendant Tracy
demonstrated callous or reckless disregard for Plaintiff's
constitutional rights.  Defendant Tracy was Chief Counsel, the
highest-ranking attorney, at the Division of Parole during the
relevant period, and testified that part of his job was to make
sure that DOP policies followed the federal Constitution and
that the agency did its best to comply.  (Tr. at 156, 160.)  He
testified that in the "latter part of 2006" he became aware of
the Second Circuit's *Earley I* decision, and that he understood
that post-release supervision had to be pronounced by a judge
and not added by DOCS.  (*Id.* at 160.)  He admitted to knowing

that *Earley I*, as soon as he read it, would have a big impact on a large number of individual defendants on parole and post-release supervision, but still "did not change [the DOP] policies as to keeping people under [PRS]" in response to *Earley I*. (*Id*. at 161-63.)  Tracy further testified that he knew that after *Earley I* was decided, his delay and lack of action would lead to periods of illegal incarceration for those who were incarcerated for violating unconstitutional PRS sentences.  (*Id*. at 164.)

Tracy testified that between 2006 and 2008, there was a "mainframe" that the DOP and DOCS could use to see whether or not there was an illegal, administratively-imposed PRS sentence on a criminal defendant's record.  (*Id*. at 163.)  Tracy also testified that he believed it was "the Department of Corrections [and not his agency, the Division of Parole, that] was the primary agency that was responsible for executing an individual's sentence and memorializing [the sentence] on the appropriate mainframe."  (*Id*. at 164.)   Yet, Defendant Tracy also testified, that as an agency head, he did not coordinate or discuss the Second Circuit's *Earley I* decision after he became aware of it.  (Id.)

Tracy admitted at trial, "I knew there may well be a person out there for whom we issued a warrant who had never heard about post-release supervision at all at the time of

sentencing." (*Id*. at 182.)  He also testified that in June 2007, he knew that it was a "possibility" that the information about post-release supervision that DOP was relying on "might be inaccurate" when issuing warrants to extradite criminal defendants for violating illegal PRS sentences.  (*Id*.) Defendant Tracy also testified that he did not instruct DOP officials to conduct the basic task of confirming whether a PRS sentence was legal before issuing a warrant, despite his own knowledge that illegal PRS sentences were a possibility.  (*Id*.) Specifically, Defendant Tracy stated that he did not attempt to retrieve and review Santiago's sentencing minutes before seeking the warrant to arrest Santiago for violating his illegal PRS sentence.  (*Id*.)

> **c)   *Testimony of Fischer – then-Commissioner of DOCS***

Lastly, the Court finds that there was sufficient evidence at trial for a jury to find that Defendant Fischer acted with callous or reckless disregard for Plaintiff's constitutional rights, in his capacity as DOCS Commissioner. Fischer testified that he was aware of *Earley I*'s impact on DOCS policies concerning post-release supervision.  (*Id*. at 188-89.) He testified that he and Annucci along with others in the DOCS legal counsel office had conversations about *Earley I* and that he understood any sentence not imposed by a judge was considered

34

"null and void," and violated the Constitution.  (*Id*.)
Nonetheless, the jury heard Fischer testify that, despite his
knowledge that the administratively-imposed PRS sentences were
unconstitutional, it was he who "made the decision to keep PRS
in place for those that DOCS had already imposed it upon."  (*Id*.
at 190.)

Though Fischer testified to believing he had "no
authority" "to release individuals without a court order," he
also stated he understood that *Earley I* was a court order
requiring him and other DOCS officials to "find a process by
which [they] could correct the problem."  (*Id*. at 202.)  Fischer
specifically testified that he "took no such steps" "in Mr.
Santiago's case" to ameliorate the problem though he was on
notice that the administratively-imposed PRS sentences violated
constitutional rights.  (*Id*.)  Fischer testified that he kept in
place PRS sentences that DOCS had already imposed, though he
knew that "individuals, like [Plaintiff], may have been remanded
from serving an illegal PRS sentence and might end up back in
prison."  (*Id*. at 190.)  Based on the foregoing, the jury's
award of damages was sufficiently supported by the evidence.

### 3.   The Punitive Damages Award

Next, the Court must determine whether the punitive
damages awarded by the jury in this case were excessive.  The
jury's verdict found that Defendants were jointly and severally

liable to pay $100,000 in compensatory damages, and that each Defendant was liable individually for $250,000 in punitive damages.  Defendants argue that the punitive damages awards should be vacated or substantially reduced due to the factors stated in *BMW of N. Am. v. Gore*, 517 U.S. 559, 574-75 (1996).

To determine whether the punitive award is excessive, the Supreme Court in *Gore* identified three "guideposts" for the Court's consideration: "1) the degree of reprehensibility; 2) the disparity between the harm or potential harm and the punitive damages award; and 3) the difference between the remedy and the civil penalties authorized or imposed in comparable cases."  *Gore*, 517 U.S. at 574-75; *DiSorbo v. Hoy*, 343 F.3d 172, 186 (2d Cir. 2003).

An award of punitive damages should be reversed only if it is "so high as to shock the judicial conscience and constitute a denial of justice." *Hughes v. Patrolmen's Benevolent Ass'n*, 850 F.2d 876, 883 (2d Cir. 1988) (*quoting Zarcone v. Perry*, 572 F.2d 52, 56-57 (2d Cir. 1978)).  "The Second Circuit instructs that '[i]n gauging excessiveness, [courts] must keep in mind the purpose of punitive damages: to punish the defendant and to deter him and others from similar conduct in the future." *Anderson v. Osborne*, No. 17-CV-539, 2020 WL 6151249, at *7 (S.D.N.Y. Oct. 20, 2020) (alterations in

original) (quoting *Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir. 1996)).

In conducting the *Gore* analysis, further detailed below, the Court finds that the punitive damages against each Defendant are not excessive.

### a)    *Degree of Reprehensibility*

Under the first prong of *Gore*, evidence at trial supported the jury's finding that Defendants engaged in reprehensible conduct against Plaintiff by intentionally enforcing, instead of rescinding, his illegal, null and void PRS sentence, thus causing Plaintiff's unlawful incarceration for 240 days (or seven months and 26 days).  "The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) (quoting *Gore*, 517 U.S. at 575).  The Supreme Court has "instructed [lower] courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."  *Id*. at 419.

The Supreme Court aptly instructed in *Gore*, "[c]ertainly, evidence that a defendant has *repeatedly* engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law."  517 U.S. at 576–77 (emphasis added).

The trial evidence established that Defendants were aware of the *Earley I* decision, deliberately failed to ameliorate Plaintiff's illegally imposed PRS sentences, and allowed the unconstitutional incarceration of Plaintiff, and eight thousand others similarly situated to continue after the Second Circuit declared the DOC's and DOP's PRS sentences to be null, void, and in violation of the federal Constitution.  The wrongful incarceration of Santiago caused physical restraints on Santiago's liberty and emotional harm.  (Tr. at 42-55.)  As noted above, there was evidence to support the jury's award of punitive damages, based on Defendants' knowledge that their acts of imposing and enforcing PRS was unlawful and caused Plaintiff and thousands of individuals to be "locked up" (*id*. at 109), thus establishing each Defendant's indifference or reckless disregard of Plaintiff's constitutional rights.  Moreover, the Defendants' conduct and lack of action was repeated multiple times with regard to thousands of state criminal defendants.

The Court finds that the evidence presented at trial, and discussed at length above, reflects each Defendants' reprehensible conduct, as it was repeated, reckless and culminated in depriving Plaintiff's liberty and thousands of others of their liberty.  Defendants all knew of *Earley I* and all chose to continue to ignore *Earley I*'s proscriptions and instead "engage[] in prohibited conduct," all of which demonstrated Defendants' "disrespect for the [Second Circuit's] law" when they knowingly failed to respond appropriately to rectify the established constitutional violation.  (*Id.*)

Furthermore, Plaintiff's liberty was deprived by Defendants repeated conduct, and he was incarcerated for 240 days due to an illegal PRS sentence that could have been but was not excised.  (Tr. at 42.)  Plaintiff testified to having his hands and feet shackled, being separated from his wife, and being exposed to violence inside prison.  (Tr. at 50-55.)  When asked to describe his incarceration and the loss of his liberty, Santiago testified, "It's like being buried alive.  You there but you don't exist.  You not doing nothing.  You not moving forward."  (Tr. at 55.)  The jury witnessed the obvious emotional pain as he wept at points during his testimony, and likely credited his testimony and found that each Defendant acted in a reprehensible manner.

Considering the Defendants' repeated and continued lack of compliance with the Second Circuit's decisions, the deprivation of liberty suffered by Plaintiff and thousands of others, and the Plaintiff's testimony regarding the harm he suffered, the first *Gore* factor militates in favor of punitive damages.

### b)   *Proportionality to Compensatory Damages*

Next, *Gore* directs courts to consider "whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred." *DiSorbo*, 343 F.3d at 187.  The reasonableness determination "does not entail a simple mathematical formula, as there may be cases where a particularly egregious act has resulted in only a small amount of economic damages." *Id*. (quotation marks omitted).  "The Supreme Court has repeatedly stressed the impossibility of making any bright-line test," and that "the propriety of the ratio can vary enormously with the particular facts of the case." *Payne v. Jones*, 711 F.3d 85, 201 (2d Cir. 2013) (citing *Gore*, 517 U.S. at 582–83.).  "When the compensable injury was small but the reprehensibility of the defendant's conduct was great, the ratio of a reasonable punitive award to the small compensatory award will necessarily be very high." *Id*.  The

Court finds that the punitive damages awarded against each
Defendant are reasonable.

As an initial matter, the ratio between the punitive
damages award of $250,000 against each Defendant, in proportion
to the $100,000 compensatory damages for which the Defendants
are jointly and severally liable, is not unreasonable. *Manzo v.
Sovereign Motor Cars, Ltd.*, No. 08-CV-1229 (JG)(SMG), 2010 WL
1930237, at *5 n.6 (E.D.N.Y. May 11, 2010), *aff'd*, 419 F. App'x
102 (2d Cir. 2011) (finding that consideration of the ratio
between compensatory and punitive damages is appropriate because
"punishing and deterring the individual defendant", are valid
purposes of punitive damages).  "Joint and several liability,"
by its nature, "imposes on each wrongdoer responsibility for the
entire damages awarded, even though a particular wrongdoer's
conduct may have caused only a portion of [it]." *Rodick v. City
of Schenectady*, 1 F.3d 1341, 1348 (2d Cir. 1993) (cleaned up).
"Because compensatory damages are assessed on a joint-and-
several basis while punitive damages are assessed individually
and with an intent to punish and deter a particular defendant,
it is counterintuitive to prorate the collective compensatory
damages amount and compare that to an individual punitive
damages amount, or to disregard the individual nature of

punitive damages."[22] *Saleh v. Pretty Girl, Inc.*, No. 09-CV- 1769

(RER), 2022 WL 4078150, at *29 (E.D.N.Y. Sept. 6, 2022)

(internal citations omitted).  Thus, the Court will compare the

individual punitive awards with the total compensatory award.

> Indeed, the jury was specifically instructed:
>
> > There are three defendants in this case, and
> > it does not follow that if you award damages
> > against one defendant, the other defendants
> > must also pay damages . . . .  You may, but
> > are not required to, award punitive damages
> > only if you find that a particular defendant's
> > conduct was motivated by evil motive or
> > intent, or the defendant's conduct involved
> > reckless or callous indifference to the
> > plaintiff's federal constitutional rights.

(Tr. at 362, 364.)

The jury's verdict form asked "[w]hat amount of

punitive damages has Plaintiff proven by a preponderance of the

evidence against each Defendant?" and the judgment states that

Plaintiff was awarded punitive damages from "each of the

Defendants."  (ECF Nos. 208, Verdict Form; 209, Judgment.)

Accordingly, for purposes of this analysis, the resulting ratio

between $250,000 in punitive damages for each Defendant, and

$100,000 in compensatory damages are, respectively, 2.5:1,

2.5:1, and 2.5:1.  Here, the damages ratios are not unreasonable

---

[22] Notably, "there is an absence of explicit direction from the Second Circuit
as to how courts should properly compute such ratios where, as here,
defendants are jointly and severally liable for compensatory damages but
individually liable for separate amounts of punitive damages." *Magalios v.
Peralta*, No. 19-CV-6188 (CS), 2022 WL 407403, at *5 (S.D.N.Y. Feb. 10, 2022);
*see also Alla v. Verkay*, 979 F. Supp. 2d 349, 374 (E.D.N.Y. 2013).

under the Constitution.  *Turley v. ISG Lackawanna, Inc*., 774
F.3d 140, 167 (2d Cir. 2014) (holding that "in the aggravated
circumstances of this case, an approximate 2:1 ratio is both
permissible under the Constitution and consistent with the
established policies adopted and adhered to by this Court"); *see
State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 425 ("Our
jurisprudence and the principles it has now established
demonstrate, however, that, in practice, few awards exceeding a
single-digit ratio between punitive and compensatory damages, to
a significant degree, will satisfy due process.")

Even if the Court incorrectly compared the $750,000
total punitive damages to $100,000 compensatory damages and the
ratio were 7.5:1, "given the constellation of intentional
misbehavior by the [Defendants]," the Court does not find the
ratio to be unreasonable.  *Johnson v. Nextel Commc'ns Inc*., 780
F.3d 128, 149 (2d Cir. 2015) ("[T]here is no rigid upper limit
on a ratio of punitive damages to compensatory damages . . . ").
"The Second Circuit has generally been reluctant to place much
weight on the ratio of punitive to compensatory damages."
*Jennings v. Yurkiw*, No. 14-CV-6377, 2019 WL 6253813, at *5
(E.D.N.Y. Nov. 22, 2019), *aff'd*, 18 F.4th 383 (2d Cir. 2021);
*see Payne*, 711 F.3d at 103 (the "ratio of punitive to
compensatory damages, by itself, tells nothing about whether the
punitive award was excessive").  Moreover, after considering the

relationship between the punitive damages award and the harm likely to, and harm that actually did, result to Santiago, the Court finds that this second factor supports the punitive damages awards.

### c)   *Comparable Civil Penalties*

For the third factor, "[c]ourts have often found it helpful in deciding whether a particular punitive award is excessive to compare it to court rulings on the same question in other cases." *Payne*, 711 F.3d at 104.  "The undertaking is precarious because the factual differences between cases can make it difficult to draw useful comparisons." *Id*. at 105.

In this unique case against high-ranking officials who are aware that a federal appeals court found their acts to be unconstitutional, the jury's verdict reflects what a reasonable juror could find based on the evidence, regarding the Defendants' failure to excise PRS, or to seek resentencing for Plaintiff with less delay, which ultimately resulted in Plaintiff's incarceration for violating an illegal PRS sentence. The jury could have found reprehensible conduct and callous disregard from Defendants' failure to comply with *Earley I*.  The jury also heard evidence of Defendants' attempt to shift the burden of rectifying their illegal acts or omissions to Plaintiff (including testimony by Defendants that inmates could have gone to the prison law library and sought relief (Tr. at

174-78, 217, 230-31)), and Defendants' attempt to minimize the harm Santiago described after he was incarcerated for violating PRS (including testimony by Defendant Annucci, likening the prison environment to a "small college in upstate New York, except for the secure perimeter fencing that surrounds it" (Tr. at 127)). The jury's punitive damages awards reflect the jury's rejection of Defendants' testimony seeking to deflect and minimize Defendants' conduct.

Although there are not many directly comparable cases of constitutional violations of this magnitude by state agency heads, the Second Circuit "ha[s] long held that, when damages are awarded, calculation of damages is the province of the jury." *Restivo v. Hessemann*, 846 F.3d 547, 587 (2d Cir. 2017) (citing *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 671 (2d Cir. 2012) (internal quotation marks omitted)). Therefore, "in reviewing damages awards, we accord considerable deference to the factual findings of both judge and jury" and "[a]lthough a review of comparable cases is appropriate, we need not average the high and low awards; we focus instead on whether the verdict lies within the reasonable range." *Id.* (cleaned up).

The Court looks to false arrest, wrongful imprisonment, and malicious prosecution cases for comparison, claims in cases which share characteristics similar to those presented here. It could be analogized that Plaintiff was

falsely arrested for violating an illegal, null and void PRS
sentence, maliciously prosecuted through proceedings to enforce
the violation of an illegal PRS sentence, and wrongfully
imprisoned for over seven months for the violation of an illegal
PRS sentence.  Santiago was incarcerated for 240 days for
violating what Defendants knew was an unconstitutional, null and
void PRS sentence, during a time that Defendants admitted their
knowledge of the Second Circuit's *Earley* decision.  (Tr. at 42;
*see supra* footnotes 14-16.)

　　　　False arrest awards include two components: (1) loss
of liberty and (2) physical and emotional distress, evidence of
which was presented at trial.  *See Martinez v. Port Auth. of
N.Y. and N.J.*, 445 F.3d 158, 161 (2d Cir. 2006) ("Nor did the
District Court err in evaluating plaintiff's emotional distress
and loss of liberty as separate components of his false arrest
claim, inasmuch as we have held previously that such components
are 'separable' and thus separately compensable[.]") (citing
*Kerman v. City of New York*, 375 F.3d 93, 125-26 (2d Cir. 2004)
(additional citation omitted)).  "An individual subjected to a
false arrest is entitled to two types of compensatory damages:
(1) for loss of liberty and (2) for physical and emotional
distress."  *Thomas v. Kelly*, 903 F. Supp. 2d 237, 262 (S.D.N.Y.
2012) (citing *Martinez v. Port Auth. of N.Y. & N.J.*, 445 F.3d
158, 161 (2d Cir. 2006); *Kerman v. City of New York*, 374 F.3d

93, 125 (2d Cir. 2004)); *see also Martinez*, 445 F.3d at 161
(noting that loss of liberty is separately compensable from
emotional distress).

Calculating older awards to 2022 dollars, false arrest
awards have ranged from approximately $12,800 to $387,000
(reflecting 2022 amounts).[23] *Dancy v. McGinley*, No. 11CV7952
(LMS), 2015 WL 13214324, at *11 (S.D.N.Y. May 11, 2015), *aff'd*,
843 F.3d 93 (2d Cir. 2016); *see Kerman*, 374 F.3d at 125
(collecting cases and noting that plaintiffs confined for mere
hours, without proof of actual damages, could collect up to
$10,000 in 2004 ($12,800 in 2022) for their loss of liberty);
*Gardner v. Federated Dept. Stores, Inc.*, 907 F.2d 1348, 1353 (2d
Cir. 1990) (reducing an award of $150,000 in 1990 ($350,500 in
2022) for the deprivation of liberty for six hours to $50,000
($115,100 in 2022)); *Bender v. City of New York*, 78 F.3d 787,
792 (2d Cir. 1996) ($150,000 in 1996 ($350,500 in 2022) where
physical injuries were minor, unlawful detention lasted 24
hours, and emotional damages were minimal); *Martinez*, 445 F.3d
at 160 (affirming the district court's decision to reduce the

---

[23] Prior jury verdicts and judicial remittiturs are proper benchmarks in
deciding the highest amount of an award that is not shocking to the judicial
conscience. *Consorti v. Armstrong World Industries, Inc.*, 72 F.3d 1003, 1013
(2d Cir. 1995), *rev'd on other grounds*, 518 U.S. 1031 (1996). Using cases
from prior years, the Court factors in an upward adjustment for inflation and
utilized an adjustment mechanism provided by the United States Bureau of
Labor Statistics on its website in order to calculate the amount of damages
to the date of the jury's verdict in November 2022. (http://data.bls.gov/cgi-
bin/cpicalc.pl). All amounts are approximate, as the Court also rounds to
the nearest hundred dollar.

plaintiff's award for deprivation of liberty to $160,000 in 2006 ($257,200 in 2022), where the plaintiff was held for approximately eighteen hours); *Marion v. LaFargue*, No. 00 Civ. 840, 2004 WL 330239 (S.D.N.Y. Feb. 23, 2004)($150,000 in 2004 ($240,200 in 2022) for six days).

Malicious prosecution cases and wrongful imprisonment cases are analogous to the circumstances in this case and show a range of damages where an individual was illegally incarcerated. *See King v. Macri*, 993 F.2d 294 (2d Cir. 1993) (upholding a $75,000 in 1993 ($156,600 in 2022) award for a malicious prosecution claim); *Gentile v. County of Suffolk*, 926 F.2d 142 (2d Cir. 1991) (upholding a $75,000 in 1991 ($165,900 in 2022) award for a malicious prosecution claim)); *see Restivo v. Nassau County*, No. 06 Civ. 6720, 2015 WL 5796966 (E.D.N.Y. Sept. 30, 2015)(18 million dollars in 2014 (or approximately $22.8 million in 2022) for eighteen years of wrongful incarceration); *Burton v. City of New York*, No. 20CV9025ATRWL, 2022 WL 9491955, at *10 (S.D.N.Y. Sept. 26, 2022), *report and recommendation adopted sub nom. Burton v. Blocker*, No. 20CIV9025ATRWL, 2022 WL 9474454 (S.D.N.Y. Oct. 14, 2022) (collecting cases and finding that an award of one million dollars to plaintiff for each year of wrongful imprisonment is fully supported by other cases).

Given that Plaintiff was incarcerated for 240 days and suffered both a loss of liberty as well as physical and

emotional harms, the awards of $150,000 joint and several compensatory damages and $250,000 punitive damages for each Defendant do not appear to be excessive.[24]  The jury clearly credited Plaintiff's testimony, and evaluated to the Defendants' reasons for their conduct.  In light of the evidence, including the injuries to which Plaintiff testified, the Court finds, based on the damages awarded in comparable cases, that the punitive damages awards do not shock the judicial conscience.  Accordingly, Defendants' request to reduce or vacate the punitive damages award is respectfully denied.

## II.  <u>Defendants' Rule 59 Motions for a New Trial</u>

### A.  Legal Standard

"A motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice."  *Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc.*, 290 F.3d 98, 106 (2d Cir. 2002) (internal

---

[24] The Defendants' Rule 50(a), 50(b), and 59 motions do not seek to vacate Plaintiff's compensatory damages award.  (*See* Defs. Mem. at 16.)  To the extent, Defendants argue, again, that the jury should have been instructed "that they should determine whether, had Plaintiff received the process he was due (a referral for resentencing), and after receiving process, the result would have been the same (the same PRS term), then he would have been entitled to no more than $1.00 in nominal damages" (*id*. at 25), the Court discusses below why it could not and would not provide instructions on speculation and how recent Second Circuit law in *Vincent* concludes that this instruction request is without merit.  *See infra* at 56-58; *see also Vincent*, 63 F.4th at 147 (remanding to the district court to consider "whether Vincent established his entitlement to compensatory damages").  In any case, the jury found sufficient evidence at trial that Mr. Santiago was entitled to $100,000 to be awarded in compensatory damages.

quotation marks omitted).  The standard applied in reviewing a party's motion for a new trial "depends on whether that party objected contemporaneously to the purported errors."  *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 124 (2d Cir. 2005).  Where objections have been preserved through contemporaneous objection, a new trial is warranted if "the district court committed errors that were a 'clear abuse of discretion' that were 'clearly prejudicial to the outcome of the trial.'"  *Id.* (*quoting Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 17 (2d Cir. 1996)); *see also Vogelfang v. Riverhead Cnty. Jail*, No. 04-CV-1727, 2012 WL 1450560, at *6 (E.D.N.Y. Apr. 19, 2012) (same).

Where claimed errors were not preserved contemporaneously at trial, "a new trial will be granted only for error that was 'so serious and flagrant that it goes to the very integrity of the trial'" because "failure to object deprives the trial court of the opportunity to correct the error during trial."  *Marcic*, 397 F.3d at 124 (quoting *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 51 (2d Cir. 1998)); *see also Lore v. City of Syracuse*, 670 F.3d 127, 160 (2d Cir. 2012) (internal citations omitted) (party who fails to object at trial to substance of verdict form "waives its right to a new trial on that ground and has no right to object to such matters on appeal . . . unless the error is fundamental").

**B.    Application**

Defendants seek a new trial on damages, asserting that they were precluded from offering evidence to defend the punitive damages claim, and because the Court declined to charge the jury with an instruction for damages for procedural due process claims and a "verdict form consistent with such a charge."  (ECF No. 213, Defs. Mem. at 22.)  The Court considered the parties' motions, proposed jury charges, arguments and objections, and based its evidentiary rulings and decisions on the Federal Rules of Evidence, Federal Rules of Civil Procedure, and controlling case law, and concludes that Defendants have not met the standards for a new trial under Rule 59.

Defendants assert that they were prejudiced during the trial as a result of the Court's preclusion of two items of evidence.  The two items of precluded evidence that Defendants argue should have been admitted and would have been relevant to the jury's punitive damages assessment of the level of Defendants' callous and reckless disregard of Plaintiff's constitutional rights are: (1) Defendants' understanding of Penal Law §70.45 or Jenna's Law, and (2) their understanding of the policies of the District Attorneys and state courts in response to *Earley I*'s ruling on administratively imposed PRS. (ECF No. 213, Defs. Mem. at 2.)

As an initial matter, the Court notes that

notwithstanding the Court's ruling, the Defendants testified at trial regarding their "fair and reasonable understanding and interpretation of the law and circumstances existing at the time." (ECF No. 213, Defs. Mem. at 2; Tr. at 106-08, 132-38, 164, 171-72, 201-02, 218.) Defendants' trial testimony about Jenna's Law was of marginal relevance in explaining why they disregarded the mandates of *Earley I*, and also risked juror confusion. As the Second Circuit and this Court had previously noted, the text of Penal Law § 70.45 does not authorize state officials to impose PRS and does not excuse Defendants' violation of the Constitution.

As to the preclusion of Defendants' understanding of the post-*Earley* policies of the state courts and District Attorneys, Defendants never proffered to the Court at any time before trial (or produced to Plaintiff in discovery) what, if any, specific policies specific District Attorneys and state courts implemented in response to *Earley I*. In any event, the Second Circuit had ruled in *Betances II* that these same Defendants could not excuse their lack of compliance with *Earley I* based on the purported policies of unidentified District Attorneys and state court judges.

Thus, the Court made its rulings after reviewing Defendants' similar arguments that the Second Circuit had already found to be irrelevant to the Defendants' violation of

Plaintiff's constitutional rights.  The Court incorporates by reference and briefly summarizes its reasoning from its order ruling on Defendants' motions on these issues prior to trial.

> [I]nsofar as Defendants seek to have witnesses testify that they were relying on Penal Law § 70.45 during the events relevant to this case, the Second Circuit has already rejected the Defendants' argument that their unconstitutional conduct was excused by Penal Law § 70.45. *Earley v. Murray* ("*Earley I*"), 451 F.3d 71, 76 (2d Cir. 2006) (holding that the DOCS practice of adding PRS to a sentence where Penal Law § 70.45 required it, but the sentencing judge had not imposed it, was unconstitutional), *reh'g denied*, 462 F.3d 147, 150 (2d Cir. 2006) ("*Earley II*"); *Betances v. Fischer* ("*Betances II*"), 837 F.3d 162, 165 (2d Cir. 2016).  Specifically, in 2006, the Second Circuit found the administrative imposition of PRS by DOCS unconstitutional.  *Earley I*, 451 F.3d at 76.  Defendants' argument that they could properly rely on Penal Law § 70.45 after *Earley I* and *Earley II* is difficult to square with the statutory text and cannot be reconciled with Second Circuit precedent. Penal Law § 70.45 has not ever, on its face, stated that DOCS was authorized to administratively impose post-release supervision; thus the existence of a state law does not excuse Defendants from scrupulously following the federal Constitution.

(ECF No. 202, Nov. 25, 2022 Order at 4.)

Similarly, Defendants argue that they are entitled to a new trial based on the Court's ruling denying Defendants' motion to argue (as opposed to admitting evidence) that they were not the cause of any damages because of their understanding of the unidentified and undisclosed policies of unidentified

District Attorneys and state court judges as to PRS.[25]  Again,
this Court followed the Second Circuit decisions that policies
of the District Attorneys and state court judges were irrelevant
to Defendants' liability.  As the Second Circuit made clear in
*Betances II*, whether or not there was a "formal mechanism" to
initiate resentencing, "the decision to review . . . records and
notify state judges and district attorneys about defendants who
needed to be re-sentenced required no cooperation from others"
and "[i]f the district attorneys and judges ultimately rejected
compliance, the re-sentencings would not have taken place, but
the defendants would have satisfied their obligation[.]"  837
F.3d at 174.  Thus, Defendants' liability, as held by the Second
Circuit, is premised on Defendants' failure to "make an
objectively reasonabl[e] effort to relieve plaintiffs of the
burdens" of administratively-imposed terms of PRS, despite
knowing that their terms "violated federal law."  *Id*. (internal
quotation marks and citations omitted).  Defendants unilaterally
imposed PRS without statutory or constitutional authority, but
following the *Earley I* decision, failed to seek resentencing and
failed to vacate the PRS sentences that they unlawfully imposed.

Despite the Court's ruling precluding the two
categories of evidence now at issue, the Defendants' post-trial

---

[25]  Defendants' pretrial motions did not disclose specific information
regarding the policies, the state courts, or District Attorneys.  Nor did
Defendants produce this information to Plaintiff in discovery.

motions themselves point out that the Defendant nonetheless testified regarding their post-*Earley I* actions. (*See* Defs. Mem. at 16-17.) The jury found that Defendants responses were insufficient to overcome evidence of their callous or reckless disregard of Plaintiff's Constitutional rights.

Finally, the Court respectfully rejects Defendants' argument that the jury should have been instructed that they should speculate whether, if Plaintiff had received the process he was due, he would have been resentenced to PRS and subjected to the same punishment, and would have been entitled to merely nominal damages. (ECF No. 213, Defs. Mem. at 25.) The Court denied Defendants' proposed hypothetical instruction because of the unspecified dates and speculative nature of what a state court judge would do at resentencing. Indeed, the trial evidence established that in 2010, when Santiago was brought back before the state judge for resentencing, the judge declined to impose PRS *nunc pro tunc*, and specifically noted, "[i]t appears that there was no discussion or agreement concerning post-release supervision as part of [Santiago's] sentence." (Plaintiff's Ex. 3.)

As the Second Circuit has recently noted, in *Vincent v. Annucci,* 63 F.4th 145 (2d Cir. 2023), Defendants' argument, that had Defendant Annucci promptly referred Plaintiff for resentencing after *Earley I*, the state court would likely have

imposed PRS *nunc pro tunc,* is without merit.  The Second Circuit
in *Vincent* held that it would have been *improper* to attempt to
resentence a defendant *nunc pro tunc*, after the individual has
already been wrongfully imprisoned by DOCS and DOP for a PRS
violation, finding, "[f]or defendants like Vincent [and Santiago
in this case], resentencing was not an available corrective
measure for the simple reason that their incarceration was a
consequence of an unconstitutional sentence that DOCS, not the
*court*, had imposed."  *Id*. at 153. (emphasis added).  The *Vincent*
Court also addressed "whether DOCS needed court approval to
eliminate the PRS term that it alone had imposed."  *Id*. at 154.
The Court ruled, "[a]t a minimum, Annucci was obligated to 'at
least attempt to cease [DOCS's] administrative and custodial
operations that had been held to violate federal law.'  And, as
a state official, Annucci was not permitted to float the
Constitution or federal law, even if there were state laws to
the contrary."  *Id.* (footnote and citations omitted).

        The jurors were instructed to assess Santiago's claim
that he suffered a compensable harm (1) from Defendants' failure
to promptly refer Plaintiff for resentencing or excise his PSR,
and (2) from Defendants' active imposition and enforcement of an
unconstitutional term of PRS, which resulted, *inter alia*, in
Santiago's extradition from Virginia, charges that he violated
the terms of his New York state parole, his subsequent

incarceration in New York from June 2007 to January 31, 2008,
and his return to New York parole supervision by February 1,
2008.  Indeed, it was established at trial, that when Plaintiff
was eventually referred for resentencing in 2010, the state
court declined to impose a PRS term and released Plaintiff.
(*Tr*. at  57-58.)

        Finally, contrary to Defendants' post-trial arguments,
the Court gave clear instructions to the jury that it was the
Plaintiff's burden to prove damages caused by each Defendant,
and Defendants' burden to prove any mitigating factors.  The
Court instructed:

> You shall award compensatory damages only for
> those injuries which you find that plaintiff
> has proven by a preponderance of the evidence
> as to the specific defendant you are
> considering.  Moreover, you may award
> compensatory damages only for those injuries
> which you find plaintiff has proven to have
> been the proximate result of conduct by the
> defendant in violation of Section 1983.  That
> is, you may not simply award compensatory
> damages for any injury suffered by plaintiff—
> you may award compensatory damages only for
> those injuries that resulted from the conduct
> by the defendant that violated plaintiff's
> federal rights under color of law.

(ECF No. 205, Final Jury Charge at 23; Tr. at 363.)

        The Court also provided an instruction on
mitigation of damages:

> The plaintiff has a duty to use reasonable
> efforts to mitigate damages. To mitigate means
> to avoid or reduce damages. You must determine

57

> whether the plaintiff could have done
> something, after the injurious conduct, to
> lessen the harm that he suffered. The burden
> is on the defendant to prove mitigation, by a
> preponderance of evidence, that the plaintiff
> could have lessened the harm that was done to
> him, and that he failed to do so.

(*Id.* at 26; Tr. at 367.)

As discussed at length above, Plaintiff submitted evidence to the jury about how Defendants had multiple opportunities to either excise Santiago's PRS sentence or attempt to refer him for resentencing, as early as late 2006, when all three Defendants knew about *Earley I.* Defendants testified at trial about the logistical process and perceived impediments in acting expeditiously in response to *Earley*, including that they believed they needed a court order to excise a sentence (Tr. at 202), the lack of complete records such as individuals' sentencing minutes (*id.* at 138, 162-63, 226), their efforts to create a comprehensive database of the illegal PRS sentences (*id.* at 229-31), and their efforts to organize and disseminate that information to county officials (*id.* at 234-35).  Both parties also discussed causation at length in their summations.  (Tr. at 308, 330, 332, 335, 340.)

Based on sufficient trial evidence, including evidence of all of Defendants' purported "impediments" in relieving Santiago from his illegal PRS sentence (for which he ended up serving over seven months, precisely because Defendant enforced

58

the illegal PRS sentence), the jury concluded that Plaintiff suffered a compensable injury, and that Defendants' conduct warranted compensatory and punitive damages.  Accordingly, the Court finds no "clear abuse of discretion" in its decisions on the parties' motions *in limine* and its jury instructions, which attempted to follow Second Circuit decisions, and further finds that its rulings were not "clearly prejudicial to the outcome of the trial." *Pescatore*, 97 F.3d at 17.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court respectfully denies the Defendants' motions pursuant to Rule 50(b) and 59. The Court directs the parties to confer regarding the award of pre-judgment interest, costs, and attorneys' fees and to jointly report to the Court via ECF within thirty days of this decision.

**SO ORDERED.**

Dated:     April 16, 2023
           Brooklyn, New York

**KIYO A. MATSUMOTO**

United States District Court

Eastern District of New York