United States District Court
Eastern District of New York

-----------------------------------X

Jesus Santiago,

Plaintiff,

- against -

Brian Fischer, et al.,

Defendants.

-----------------------------------X

**Memorandum and Order**

No. 12-cv-2137 (KAM) (ST)

**Kiyo A. Matsumoto, United States District Judge:**

This case has a complicated litigation and procedural history. This history began in 2012 when the Plaintiff, Jesus Santiago, sued state officers seeking compensatory and punitive damages alleging that Defendants had unlawfully enforced an administratively imposed term of state post-release supervision ("PRS"). Plaintiff sought relief under 42 U.S.C. § 1983 for two periods of incarceration, the first from June 12, 2007 to February 6, 2008, and the second from September 14, 2010 to December 16, 2010. Prior to trial, this Court held that the Defendants were entitled to qualified immunity for the 2010 period of incarceration. *See Santiago v. Cuomo*, No. 12-CV-2137, 2017 WL 11929991, at *10 (E.D.N.Y. Sept. 30, 2017) ("*Santiago I*").

Between November 28-29, 2022 the case was tried on the June 2007 to February 2008 period of incarceration. On November 30,

2022 the jury returned a verdict in favor of Plaintiff and awarded Plaintiff (1) compensatory damages in the amount of one hundred thousand dollars ($100,000), jointly and severally against the Defendants, Fischer, Annucci, and Tracy and (2) punitive damages of two hundred fifty thousand dollars ($250,000) against each of the individual Defendants, Fischer, Annucci, and Tracy, totaling seven hundred and fifty thousand dollars ($750,000). (ECF No. 209 (Judgment).)

As relevant to the motion now at issue, the Second Circuit subsequently determined that its precedents required the denial of qualified immunity as to the 2010 period, vacated this Court's prior judgment, and remanded for further proceedings.[1] *See Santiago v. Fischer*, 158 F.4th 397 (2d Cir. 2025) ("*Santiago II*")..

Presently before the Court is the Defendants' motion for partial summary judgment dismissing the 42 U.S.C. § 1983 claim for damages arising from the 2010 period of incarceration. (ECF No. 285.)

For the reasons stated below, the Court denies the Defendants' motion for partial summary judgment.

## BACKGROUND

Given the fourteen-year history of this case, the Court will summarize only the history relevant to the pending motion for

[1] The Second Circuit separately ordered a new trial on the 2007-2008 period of incarceration. *See Santiago II*, 158 F.4th 397 (2d Cir. 2025).

partial summary judgment.[2]

**I. New York's PRS Legislation and Related Federal Litigation**

The New York State Sentencing Reform Act of 1998 requires that a term of PRS be a part of every determinate sentence. *See* N.Y. Penal Law § 70.45(1) (sentencing courts must "state not only the term of imprisonment, but also an additional period of post-release supervision."). Despite this requirement, the Second Circuit has noted that "some [State] judges did not pronounce PRS terms during sentencing proceedings" and "[i]nstead of bringing the failure to the attention of the sentencing court, [the Department of Correctional Services ("DOCS")] simply added the PRS term administratively." *Betances v. Fischer*, 837 F.3d 162, 165 (2d Cir. 2016) ("*Betances II*"). In such cases, "the inmates began to serve their PRS terms under [Division of Parole ("DOP")] supervision," and "DOCS and DOP were authorized to reincarcerate an offender who, after a hearing, was found to have violated the conditions of release." *Id.*

In 2006, the Second Circuit addressed the constitutionality of DOCS's practice of adding a PRS term to sentences and held that a habeas petitioner's due process rights were violated where DOCS administratively added a period of PRS to a sentence where no term

[2] A more complete summary of the facts is set forth in ECF Nos. 92 (Sept. 30, 2017 Or.) at 2-8; 128 (Sept 23, 2019 Or.) at 2-11; 244 (2d Cir. Mandate) at 4-19.

of PRS was imposed by a judge. *See Earley v. Murray*, 451 F.3d 71, 76 (2d Cir. 2006) ("*Earley I*"). Because Earley's PRS term had not been imposed by the judge, PRS was never part of his sentence, and the PRS term was a "nullity." *Id.* at 76. The Second Circuit remanded the case to the district court, with instructions that, if Earley's habeas petition was timely, the district court was to "excis[e] the term of post-release supervision from Earley's sentence and reliev[e] him of any subsequent penalty or other consequences of its imposition." *Id.* at 76-77.

"The holding in *Earley I* was met with resistance at the state level. Certain district attorneys expressed their disagreement with [the Second Circuit's] holding." *Betances II*, 837 F.3d at 166. In 2008, in response to *Earley I*, the New York State Legislature "authoriz[ed] corrections officers to initiate resentencing proceedings in order to re-impose terms of post-release supervision." *Santiago II*, 158 F.4th at 400. In June 2008, the New York State Legislature amended New York law to establish a process for DOCS and DOP to refer individuals for resentencing who appeared to have had PRS unlawfully added to their sentences. *See* N.Y. Correction Law § 601-d.

> The new statutory procedure allowed the DOCS and the DOP to notify state courts and defendants about potentially unpronounced terms of post-release supervision and thereby to trigger remedial proceedings. If the state court determined that the term of post-release supervision had been pronounced, the state court was required to issue a superseding commitment order and

> accompanying decision confirming as much. If the state court determined that the term may not have been pronounced, the state court would convene a resentencing proceeding with the prosecutor and the defendant at which the defendant could be properly sentenced with or without the otherwise mandatory term of post-release supervision.

*Santiago II*, 158 F.4th at 405 (citing N.Y. Correction Law § 601-d(2)-(5) and N.Y. Penal Law § 70.85.).

## II. Factual Background

In January 2000, Plaintiff was indicted in New York State Supreme Court, Kings County, on two counts of assault, two counts of criminal possession of a weapon, and one count of criminal possession of a loaded firearm. (*See* ECF 289 (Declaration of Steven H. Philbrick ("Philbrick Decl.")) ¶ 51; *Santiago II*, 158 F.4th at 401.) After Plaintiff was released on bond pending his criminal trial, he left New York State. (*Id.*)

In mid-2001, Plaintiff was arrested in Virginia on separate federal charges and was ultimately sentenced to thirty-seven months' federal imprisonment and a four year term of federal supervised release all while his New York charges remained pending. (ECF No. 286 ("56.1 Statement", ECF No. 292 "56.1 Counter Statement" ¶ 29).)

In May 2002, while still serving his federal sentence, Plaintiff pleaded guilty in New York state court before Justice Sheldon Greenberg to one count of criminal possession of a weapon, in full satisfaction of all five New York state charges. (56.1

Statement, 56.1 Counter Statement ¶ 30; ECF No. 12-3 ("Sentence and Order of Commitment")(original sentence of January 2, 2002, indicating nunc pro tunc sentence received by DOCS on April 22, 2004).)

Later that month, a state court sentencing hearing was held before a different judge—Justice Gustin Reichbach. The sentencing minutes and/or any transcription of this sentencing hearing have never been found. (56.1 Statement, 56.1 Counter Statement ¶ 33.) After sentencing, a court clerk filled out a Sentence and Order of Commitment form reporting the results of the sentencing hearing. The clerk recorded the agreed-upon term of imprisonment of three and a half years running nunc pro tunc from January 2, 2002, and concurrently with the federal sentence. The Commitment form did not state any term of state PRS. (*Id.* ¶ 34; Philbrick Decl. ¶ 51; Sentence and Order of Commitment.)

In April 2004, after being released from federal prison, Plaintiff entered DOCS custody to serve his state term of imprisonment. (56.1 Statement, 56.1 Counter Statement, ¶ 36). On November 7, 2004, Plaintiff was conditionally released to the New York State DOP to begin a non-judicial five-year period of state PRS, calculated to expire on November 7, 2009. (*Id.* ¶ 37.) The remaining portion of his prison term was "held in abeyance." N.Y. Penal Law §§ 70.40(2), 70.45(5)(a). In 2005, Plaintiff left New York state in violation of the state PRS terms. (56.1 Statement,

56.1 Counter Statement, ¶¶ 37-38.)

In October 2006, Plaintiff was arrested by federal authorities in Virginia and appeared before the U.S. District Court for the Eastern District of Virginia which sentenced him to eight months' of federal imprisonment and thirty months' of federal supervised release. (*Id.* ¶ 39.)

In June 2007, Plaintiff was transferred from Virginia to New York. (Philbrook Decl. Exh. C ("Chrono Report") at 14; 56.1 Statement, 56.1 Counter Statemen ¶ 41.) In New York, Plaintiff was charged with violating the terms of his state PRS, and was returned to DOCS supervision to serve a 12-month "assessment" in custody. (Chrono Report at 12-14; 56.1 Statement, 56.1 Counter Statemen ¶ 42.)

On January 31, 2008, Plaintiff was released from state prison, subject to both federal and state PRS. Plaintiff failed to report to his state parole officer on February 6, 2008, and was deemed to have absconded. (Chrono Report at 11-12.) In April 2008, Plaintiff was arrested in Virginia and imprisoned on new Virginia charges, and was held in that jurisdiction. (*Id.* at 10; 56.1 Statement, 56.1 Counter Statement, ¶ 46.)

On September 14, 2010, Plaintiff was transferred back to New York on charges of violating the conditions of his New York State PRS. (Chrono Report at 2; 56.1 Statement, 56.1 Counter Statement, ¶ 47.) On September 27, 2010, DOP referred Plaintiff to King's

County Supreme Court for possible resentencing, having determined that Plaintiff's "original sentence and commitment document . . . contained no reference to a period of PRS" and that DOP did not "have a copy of the sentencing minutes within its files to confirm whether the period of PRS was pronounced by the Court at the time of sentencing." (Philbrick Decl. Exh. D at 1 (Notice Pursuant to Correction Law 601-d).)

On December 15, 2010, Plaintiff's sentencing court declined to re-sentence him stating that there was "no discussion or agreement concerning post release supervision as part of [Plaintiff's] sentence reflected anywhere in the proceedings," and that "[a]ny pending violation or prior revocation of a DOCs assessed period of PRS is deemed a nullity and is vacated." (Philbrook Decl. Exh. E (December 15, 2010 Resentencing Or.).) Plaintiff was released from DOCS custody on December 16, 2010. (56.1 Statement, 56.1 Counter Statement, ¶ 53.)

## III. Procedural History

In May 2012, Plaintiff sued state corrections officers in this Court for violating his rights under 42 U.S.C. § 1983, seeking compensatory and punitive damages for enforcing the term of state PRS that was not orally pronounced by the judge at his 2002 state sentencing. (ECF No. 12 (Am. Compl.).) Plaintiff alleged that "defendants failed to seek to remove [his] PRS or have him resentenced or otherwise released after the issuance of *Earley*."

(*Id.* at ¶ 77.)

In 2017, the parties cross-moved for summary judgment, and, among other things, the Defendants sought a ruling that they were shielded by qualified immunity as to the 2010 period of incarceration. (ECF Nos. 79 (Mot.), 80 (Memo.) at 17-19.) Defendants argued that, as to the 2010 period, "when Plaintiff was extradited back to New York and referred by Defendants to his sentencing court[,] Defendants acted extremely promptly, referring Plaintiff for resentencing within two weeks of receiving him on September 19, 2010." (*Id.* at 17—18.)

This Court concluded that Defendants were entitled to qualified immunity after Plaintiff was extradited back to New York in September 2010 because the Defendants "developed a process for resentencing individuals serving administratively-imposed terms of PRS" and that, following this process, the Defendants took reasonable steps at that point to bring DOCS and DOP into compliance with *Earley I*. (ECF No. 92 (Or.) at 32-33.)

Plaintiff proceeded to trial on his remaining claims (stemming from the June 2007 to February 2008 period of incarceration) and the case was tried to a jury in November 2022. The jury awarded compensatory and punitive damages to Plaintiff. (ECF No. 208 (Jury Verdict).) Following the conclusion of his trial, Plaintiff appealed, among other things, the qualified immunity ruling as to the 2010 period of incarceration. (ECF No.

227 (Notice of Cross Appeal).)

On October 30, 2025, the Second Circuit determined this Court's qualified immunity ruling for the 2010 period of incarceration "conflict[ed] with our statement in *Hassell v. Fischer* that the defendants are foreclosed by *Betances II* from arguing that their belated, albeit reasonable, steps to comply with *Earley I* excuse the initial unreasonable delay." *Santiago II*, 158 F.4th at 413 (quoting *Hassell v. Fischer*, 879 F.3d 41, 51 (2d Cir. 2018)). The Second Circuit vacated this Court's order granting summary judgment as to the 2010 period based on qualified immunity, but stated that "evidence of impediments is relevant to determining whether the defendants caused Plaintiff's detention during that period." *Id.* at 414. The Second Circuit continued:

> On summary judgment, the district court determined that in 2008 the defendants "began to take what the Second Circuit termed 'reasonable steps toward bringing DOCS and DOP into compliance with *Earley I*'" but that the defendants could not have acted before September 2010 with respect to Santiago, who "was not within New York's jurisdiction until September 14, 2010." *Santiago*, 2017 WL 11929991, at *10 (quoting *Betances*, 837 F.3d at 172). While the defendants cannot obtain qualified immunity, these arguments may be relevant to any renewed motion for summary judgment with respect to liability for 2010. We remand to allow the district court to consider, on any such motion, the effect that evidence of impediments may have on the defendants' defense to liability for that period.

*Id.*

**IV. Motion for Partial Summary Judgment**

On remand, Defendants move for partial summary judgment

seeking dismissal of Plaintiff's claim for damages for the 2010 period. (ECF Nos. 285, (Mot.), 287 (Memo.).) Neither party sought further discovery, but Defendants filed a declaration from Steven Philbook and corresponding exhibits from discovery obtained earlier in the case. (*See* ECF No. 289.)

In support of their motion, Defendants argue that in order to be entitled to a damages award, Plaintiff must prove that Defendants did not face any legal or practical impediment to release. (ECF No. 287 at 14.) Defendants argue that Plaintiff cannot meet his burden of proof because they faced the following impediments: (1) the requirement under N.Y. Correction Law § 601- d that DOCS needed to obtain a court order before relieving Plaintiff of his sentence; (2) Plaintiff's sentencing minutes were never located and thus DOCS could not confirm that his sentence was flawed; and (3) Plaintiff's Sentence and Commitment order did not identify any PRS term. (*Id.* at 14-22.) Defendants further argue that Plaintiff did not suffer actual injury and is therefore entitled only to nominal damages. (*Id.* at 23.)

Plaintiff opposes the motion for partial summary judgment. (ECF No. 291 ("Opp.").) Plaintiff argues that the Defendants have not identified any actual practical or legal impediment that would have caused Plaintiff's 2010 detention absent their own continued enforcement of the unlawful PRS term. (*Id.* at 15-16.) It is undisputed that a New York parole warrant was issued and executed,

pursuant to which Plaintiff was extradited to New York and placed into custody. (*Id.* at 16.) "[B]y the time [Plaintiff] was extradited in September 2010, it was settled law that no court could lawfully put [PRS] back onto [Plaintiff's] sentence." (*Id.* at 18.) As Plaintiff further asserts, Section 601-d took effect in June 2008, and, by September 2010, the "referral machinery" was working. (*Id.* at 21.) Plaintiff argues that "[if] the Court concludes that some initial processing period is not fairly attributable to Defendants, the remedy is to define the compensable window and send the rest to the jury[.]" (*Id.* at 24.)

In reply, Defendants argue that they had a "legal obligation to follow the procedures set forth in § 601-d to refer Plaintiff for a resentencing hearing" in September 2010 when DOP learned that Plaintiff's PRS term may not have been orally pronounced. (ECF No. 290 ("Reply") at 1-2.) Defendants reiterate the alleged legal and practical general impediments to Plaintiff's release, but do not submit evidence as to what specific acts they took and impediments they encountered with regard to Plaintiff. (*Id.* at 3-9.)

## STANDARD OF REVIEW

Defendants move for partial summary judgment pursuant to Federal Rule of Civil Procedure 56, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The moving party has the burden of establishing the absence of a genuine dispute as to any material fact, and in opposing summary judgment, the nonmoving party "need only present evidence from which a jury might return a verdict in his favor" to defeat a motion for summary judgment. *Id.* at 256-57. To meet this burden, however, a party opposing summary judgment must "come forward with specific facts showing that there is a *genuine issue for trial*," not merely "show that there is some metaphysical doubt as to the material facts." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

## DISCUSSION

### I. Liability, Causation, and Damages

As an initial matter, the parties disagree on the meaning of

the Second Circuit's *Santiago II* vacatur and remand. According to Plaintiff, the Second Circuit's decision denying qualified immunity was a de facto finding of liability. (*See* Opp. at 14–16.) Defendants, however, argue that the Second Circuit remanded for this Court to determine liability, with the instruction that "the 2010 period at issue should be analyzed in light of impediments." (Reply at 3, 9.)

The Supreme Court has held that "qualified immunity is an immunity from suit rather than a mere defense to liability." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In vacating this Court's qualified immunity ruling, the Second Circuit determined that the Defendants were not immune from suit, but did not make an affirmative finding of liability. Instead, the Second Circuit remanded for this Court to consider any renewed motion for summary judgment regarding liability for the 2010 period and "the effect that evidence of impediments may have on the defendants' defense to liability for that period." *Santiago II,* 158 F.4th at 414.

Defendants' liability (including causation) for their unconstitutional conduct has been extensively litigated and repeatedly determined by the Second Circuit. For example, in affirming the district court's grant of summary judgment on liability against the Defendants here, Annucci, Fischer, and Tracy, the Second Circuit has previously concluded that these Defendants' "did not make an objectively reasonably effort 'to

relieve [plaintiffs] of the burdens of those unlawfully imposed terms after [they] knew it had been ruled that the imposition violated federal law.'" *Betances II*, 837 F.3d at 174 (quoting *Vincent v. Yelich*, 718 F.3d 157, 177 (2d Cir. 2013) ("*Vincent I*").) But, as noted in a footnote, the Second Circuit stated that it had "no occasion on this appeal to consider how, if at all, the actions of others might inform any assessment of causation for specific injuries claimed by plaintiffs against these defendants. Such matters can be pursued as warranted on remand." *Id.* at 174 n.2.

To recover compensatory damages, a Section § 1983 plaintiff must prove injury and causation. *See Carey v. Piphus,* 435 U.S. 247, 263 (1978). The Second Circuit's decision in *Vincent II* involved analysis of compensatory damages causation. In *Vincent I*, the Second Circuit concluded "that *Earley I* itself clearly established that where the [sentencing] court has not included PRS in a defendant's sentence, DOCS may not add that term without violating federal law." *Vincent I*, 718 F.3d at 168. The Second Circuit also deemed it "clear" that DOCS had a Constitutional "obligation to at least attempt to cease its administrative and custodial" enforcement of PRS terms that had been held unlawful in 2006 under *Earley I*. *Id.* at 172-73. Accordingly, the *Vincent I* court remanded for development of the record "as to the objective reasonableness of Annucci's efforts to relieve [Plaintiffs] of the burdens of those unlawfully imposed terms after he knew it had

been ruled that the imposition violated federal law." *Id.* at 177.

In *Vincent II*, the Second Circuit held that damages for unconstitutional PRS could not be determined without the plaintiff first establishing the onset date for calculating damages, which, in turn, required determining whether Defendants faced any legal or practical impediments that would have delayed their ability to release the plaintiff. 63 F.4th at 154. "At a minimum, Annucci was obligated to "at least attempt to cease [DOCS's] administrative and custodial operations that had been held to violate federal law. And, as a state official, Annucci was not permitted to flout the Constitution or federal law, even if there were state laws to the contrary. On the record before us, it is not clear whether there was any impediment, legal or otherwise, to Annucci's simply and unilaterally releasing Vincent." *Id.* (internal quotations omitted).

Therefore, *Vincent II* held that that in order to show that the prolongation of an unconstitutional reincarceration was caused by a defendant's delay in complying with *Earley I*, a plaintiff is required to show that there was no "impediment, legal or otherwise," to "simply and unilaterally releasing" the plaintiff. *Id.*

In *Santiago II*, the Second Circuit reiterated this concept, that the evidence of "the evidence of impediments is relevant to determining whether the defendants caused [Plaintiff's] detention

during that period." 158 F.4th at 414.

The Second Circuit's decision in *Santiago II* is a continuation of the *Vincent* line of cases: that a district court is required to perform a broad examination of causation concerning impediments to Defendants' ability to immediately and unilaterally discontinue enforcement of unlawful PRS.

Defendants have put forth several impediments that they claim barred Plaintiff's release. The Court, construing the facts in favor of the non-moving party and "bearing in mind that the burden rests upon the plaintiff to establish the onset date for calculating any compensatory damages to which he may be entitled," takes each of Defendant's stated impediments in turn, and determines the impediments' "validity and effect, if any, upon the length of [Plaintiff's] unlawful incarceration." *Vincent II*, 63 F.4th at 154.

**II. Legal Impediment: Correction Law 601-d**

Defendants argue that they could not have released Plaintiff before allowing the resentencing process enacted on June 30, 2008 as N.Y. Correction Law § 601-d to "run its course." (ECF No. 287 (Memo.) at 16.)

Correction Law § 601-d provides "a mechanism for courts to consider resentencing Defendants without court-ordered PRS terms." *People v. Williams* 14 N.Y.3d 198, 206, 208 (2010). The Second Circuit, however, has explained that "federal constitutional

standards rather than state law define the requirements of procedural due process. The fact that the State may have specified its own procedures that it may deem adequate for official action does not settle what protection the federal due process clause requires." *Vincent I*, 718 F.3d at 169 (internal quotations omitted); *see Garcia v. Alk*, No. 09-CV-2045, 2015 WL 1469294, at *7 (E.D.N.Y. Mar. 30, 2015) (recognizing that the Court in *Vincent I* "rejected" the argument that "a parolee is not entitled to be released from PRS obligations (even if the parolee was reincarcerated) until the parolee was resentenced by a court pursuant to § 601-d").

Defendants argue that the Second Circuit, "in vacating the grant of qualified immunity to Defendants for the 2010 period, invited reconsidering whether Defendants could be liable at all for enforcing PRS at a time where they were bound to adhere to the remedial legislation, Correction Law § 601-d." (ECF No. 287 (Memo.) at 16.) Defendants quote a portion from *Santiago II* that states "[t]he sole remedy for a procedural error such as this is to vacate the sentence and remit for a resentencing hearing so that the trial judge can make the required pronouncement." (*Id.* (quoting *Santiago II*, 158 4th at 405.)) This quote, however, is from a portion of the opinion summarizing the effect of *Earley* in the state courts. And, as stated above, what actions New York State authorized officials to take to correct the unlawful PRS

terms did not usurp the protection the federal due process clause requires. Nor did the lack of such explicit statutory authority establish that Defendants were prohibited by law from acting to correct unlawful PRS terms.

The Court denies summary judgment on the ground that the Defendants' claimed impediment of Correction Law § 601-d did not prevent Defendants or DOCS from complying with *Earley* and immediately and unilaterally excising Plaintiff's unlawful PRS term.

**II. Practical Impediments: Missing Sentencing Minutes**

Defendants argue that they faced a practical impediment to releasing Plaintiff: his missing sentencing minutes. (ECF No. 287 (Memo.) at 17-20.) It is undisputed that neither DOCS nor DOP had Plaintiff's sentencing minutes and therefore could not confirm that his sentence was flawed. They do not present evidence when, if ever, the district attorney or sentencing court were requested by Defendants to locate Plaintiff's sentencing minutes after *Earley*.

Defendants argue that the "sentencing court and the district attorney were tasked with finding the sentencing minutes from 8 years earlier, which would take time, and the search itself was fruitless," and that the "lack of sentencing minutes would have caused a delay." (ECF No. 287 (Memo.) at 19.) Other courts in this Circuit have recognized that "even if Defendant Annucci

addressed the issue immediately upon the issuance of the *Earley II* decision, it would still take a period of time to take whatever corrective action was necessary." *Earley v. Annucci*, No. 9:08-CV-669 (DJS), 2018 WL 5993683, at *3 (N.D.N.Y. Nov. 15, 2018), rev'd and remanded, 810 F. App'x 60 (2d Cir. 2020). It is possible then that the review period would precede the "onset date" for calculating damages to which Plaintiff would be entitled.

Addressing the implications of *Vincent* in a class-action seeking damages for Defendants' unconstitutionally imposing post-release supervision, Judge Lehrburger examined the extent to which, if at all, any practical impediments delayed Defendants' ability to release Plaintiffs from unlawful PRS. *See Betances v. Fischer*, No. 11-CV-3200, 2024 WL 3848485 (S.D.N.Y. Aug. 16, 2024) ("*Betances IV Recon.*"). In the *Betances* action, Judge Lehrburger established a Sentencing Minutes Members subclass for case management purposes. Judge Lehrburger defined the Sentencing Minutes Members as "those class members whose sentencing minutes *were* in Defendants' possession at the time they violated the members' constitutional rights by imposing unlawful PRS." *Id.* at *2 (emphasis added). In certifying the class, Judge Lehrburger reasoned that "there were no practical impediments to release of the Sentencing Minutes Members. For that group, the ready availability of their sentencing minutes resolves individualized issues identified by the Court." *Id.* at *4.

While the crux of the issue here is that Plaintiff's sentencing minutes were *not* available, Judge Lehrburger's reasoning in creating the Sentencing Minutes subclass is instructive. As to the individuals whose sentencing minutes were not available, Judge Lehrburger determined that there was no uniform onset date that would apply to all class members and that the issue of practical impediments implicated individualized damages inquiries. *See Betances IV*, 2024 WL 182044 at *15, 21. More specifically, the Judge Lehrburger reasoned that "[f]our to six weeks was required for DOCS to review all commitment orders, and additional time was required to confirm whether or not PRS had been pronounced at sentencing. The length of time that additional step would have taken is a factual matter that cannot be determined on the present record and that will vary among individual cases." *Id.* at *17.

Defendants here have put forward no reason that they could not have taken the action of confirming Plaintiff's sentencing minutes were missing prior to his return to DOCS custody in 2010. Defendants have not presented relevant evidence, cited to, nor provided any information, that would allow this Court to conclude that there was no period of time during which Plaintiff remained on unlawfully imposed PRS as a result of Defendants' failure to make reasonable efforts to release him.

On this record, a jury might well conclude Defendants

unreasonably failed to seek to remove Plaintiff's PRS or have him resentenced or otherwise released during the 2010 period for some period of time. Consequently, there is an issue of material fact as to whether Defendants faced a practical impediment given Plaintiff's missing sentencing minutes for the entire period of his unlawful incarceration and Defendants will not be granted summary judgment based on this ground.

**III. Other Alleged Impediments**

Defendants contend that they "could not have relied on Plaintiff's Sentence and Commitment order as sufficient evidence that his sentence did not include a term of PRS—both a practical and legal impediment to unilateral release." (ECF No. 287 (Memo.) at 22.) Defendants further argue that the Sentence and Commitment order's silence on any PRS term impeded them from unilaterally releasing Plaintiff because "any such unilateral release risked violating a term of PRS expressly pronounced at sentencing." (*Id.* at 21.) And the fact that the Sentence and Commitment order "was a form filled out by a court clerk," did not establish that the sentencing court did not impose a PRS term. (*Id.* at 22.)

Defendants appear to argue that, along with the ambiguity created by the lost sentencing minutes, the lack of a PRS term on Plaintiff's Sentence and Commitment order created further ambiguity that acted as yet another legal and practical impediment to his release.

However, to the extent Defendants raise this issue as a legal impediment, the Second Circuit in *Earley II* held that "[w]hen a judge fails to impose a custodial element of a sentence, that element is not a part of the sentence, regardless of whether that failure was due to oversight or customary practice." *Earley v. Murray*, 462 F.3d 147, 149 (2d Cir. 2006) ("*Earley II*"). And to the extent Defendants raise this as a practical impediment, as with the sentencing minutes, a jury might well conclude Defendants failed to make an objectively reasonable effort to refer Plaintiff for resentencing for at least some of the period he was unlawfully incarcerated and Plaintiff has raised a triable issue of material fact on this issue. On the record presented to this Court, Defendants' damages causation and damages calculation for the September 14, 2010 through December 16, 2010 period is properly reserved for the jury.

In sum, Plaintiff's claims that Defendants violated his due process rights from September 14, 2010 through December 16, 2010 by administratively imposing a term of post-release supervision remains for trial. Defendants have, in their motion for partial summary judgment, failed to show that no genuine dispute as to any material fact exists regarding the validity and effect of the alleged impediments on Plaintiff's unlawful incarceration during this period. At trial, both Plaintiff and Defendants can present evidence relating to the alleged impediments and their effect.

**IV. Entitlement to Compensatory Damages**

To warrant compensatory damages, a Section § 1983 plaintiff must prove injury and causation. *See Carey v. Piphus,* 435 U.S. 247, 263 (1978). Defendants argue that Plaintiff cannot prove any compensable injury and is therefore entitled to no more than nominal damages for his loss of liberty. (ECF No. 287 (Memo.) at 22-23.)

To calculate damages, the fact finder must determine whether a different outcome would have been obtained had adequate procedural protections been given. If the outcome would not have been different, the plaintiff is presumptively entitled to no more than nominal damages. *Poventud v. City of New York*, 750 F.3d 121, 135-36 (2d Cir.2014) (en banc); *see Rentas v. Ruffin*, 816 F.3d 214, 223 (2d Cir. 2016) ("when a defendant has deprived the plaintiff of liberty, but the adverse action would have been taken even in the absence of the wrongful conduct, the plaintiff is entitled only to nominal damages.").

In support of nominal damages, Defendants rely on *Warren v. Pataki,* 823 F.3d 125, 141 (2d Cir. 2016). In *Warren*, the plaintiffs were civilly committed following their terms of incarceration. *Id.* Before commitment, the plaintiffs were evaluated by New York's Office of Mental Health but without notice or an adversarial hearing prior to civil commitment and therefore were civilly committed without due process. *Id.* At trial, the

jury found that even if plaintiffs had received their procedural due process, they would have been committed and therefore suffered no injury, leaving them with only nominal damages. *Id.* at 137.

Defendants argue that the record here is similar: "Had Defendants, before Plaintiff was absconded from Parole in 2008, referred him back to the original sentencing court to pronounce on the record the 5-year PRS term referenced during the plea, Plaintiff's due process rights would have been met by the sentencing court, and he would have faced the same consequence for having violated the terms of his PRS. Had Plaintiff received the process he was due (a referral for resentencing), and after receiving process, the result would have been the same (the same PRS term). . ." (ECF No. 287 (Memo.) at 23.)

*Warren*, however, does not support Defendants' argument. First, on appeal, the Second Circuit noted that even if a plaintiff would have been in the same position had constitutionally sufficient procedural due process been provided, "[i]t is possible that other claims for compensatory damages," specifically, mental and emotional distress, "remained viable." 823 F.3d at 144 (citing *Carey*, 435 U.S. at 264). Second, *Warren* turned on a finding that the plaintiff would have ended up with the same confinement if the proper process had been followed. Defendants here have not established, because they cannot, that Plaintiff would have been resentenced to a term of PRS had he been referred for resentencing

during the period of their liability. In fact, in December 2010, when Plaintiff appeared for resentencing in Kings County, the court found no evidence that PRS had been imposed by the sentencing court in 2002, and declined to impose PRS at resentencing.

Plaintiff, "who was incarcerated for violating the terms of an administratively imposed PRS could not have been resentenced *nunc pro tunc* for the simple reason that courts do not have the power to substantively rewrite history or backdate events." *Vincent II*, 63 F.4th at 153. Once Plaintiff served his original sentence, no court could retroactively validate DOCS's unlawful imposition of PRS. *Id.* "The remaining option, as we outlined in *Earley*, was to excise the terms of the null and void administratively imposed PRS and relieve [Plaintiff] of the conditions associated with it." *Id.*

*Vincent II*'s analysis requires a jury to determine the amount of compensatory damages, whether nominal or more. *See id.* at 151; *Patterson v. City of Utica*, 370 F.3d 322, 338 (2d Cir. 2004) ("[I]t is evident that in order to award plaintiff compensatory damages, *the jury* must determine that the injuries plaintiff claims he suffered as a result of the deprivation of his liberty interest would not have occurred if [the defendant] had provided plaintiff with [ ] sufficient [procedure]." (emphasis added)).

Defendants have failed to establish that Plaintiff is, as a matter of law, entitled to only nominal damages.

## CONCLUSION

For the reasons stated above, the Defendants' motion for partial summary judgment is **DENIED.** As stated in the parties' proposed jury instructions, ECF No. 303 at 44, they are to submit proposed instructions and verdict-sheet questions as to the 2010 period within seven days of this order, November 30, 2026. *See* Fed. R. Civ. P. 6(a)(1)(C)(deferring deadlines that fall on a weekend or legal holiday).

**So ordered.**

Dated: November 19, 2026
Brooklyn, New York

**Kiyo A. Matsumoto**
United States District Judge
Eastern District of New York